# United States Court of Appeals for the Federal Circuit

———————————————

**ERBE ELEKTROMEDIZIN GMBH and ERBE USA, INC.,**

*Plaintiffs-Appellants,*

**and**

**CONMED CORPORATION,**
*Plaintiff-Appellee,*

v.

**CANADY TECHNOLOGY LLC, AND DR. JEROME CANADY,**

*Defendants-Cross Appellants.*

———————————————

## 2008-1425, -1426

———————————————

Appeals from the United States District Court for the Western District of Pennsylvania in case no. 05-CV-1674, Chief Judge Donetta W. Ambrose.

———————————————

Decided: December 9, 2010

———————————————

PHILIP G. HAMPTON, II, Dickstein Shapiro, LLP, of Washington, DC, argued for plaintiffs-appellants. With

him on the brief was LAURENCE E. FISHER. Of counsel was STEVEN M. WAR.

JOHN G. POWERS, Hancock & Estabrook, LLP, of Syracuse, New York, argued for plaintiff-appellee. With him on the brief was ASHLEY D. HAYES. Of counsel was ERIC C. NORDBY.

TIMOTHY R. DEWITT, 24IP Law Group USA, PLLC, of Annapolis, Maryland, argued for defendants-cross appellants.

_____

Before RADER, NEWMAN, and PROST, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* PROST.
Opinion concurring-in-part, dissenting-in-part filed by *Circuit Judge* NEWMAN.

PROST, *Circuit Judge*.

Appellants ERBE Elektromedizin GmbH and ERBE USA, Inc. (collectively, "ERBE") appeal from a final decision of the United States District Court for the Western District of Pennsylvania. Following the parties' various motions for summary judgment, the district court granted summary judgment of non-infringement of U.S. Patent No. 5,720,745 ("'745 patent") in favor of Cross-Appellants Dr. Jerome Canady and Canady Technology LLC (collectively, "Canady"). The court also granted summary judgment on ERBE's trademark and trade dress claims in Canady's favor based on the lack of a legally protectable mark. Canady cross-appeals the court's grant of summary judgment on its antitrust counterclaims in favor of ERBE and Plaintiff-Appellee Con-Med Corporation ("ConMed"). We affirm.

BACKGROUND

This is a patent infringement case involving three competitor companies that create argon gas-enhanced electrosurgical products for electrosurgery. Argon gas-enhanced electrosurgery is typically performed with an electrosurgical generator to which various surgical accessories, including endoscopic probes, are attached. The generator delivers a high frequency current to the human tissue through a stream of argon gas to create uniform hemostasis of bleeding tissue, which enhances surgical effects by limiting blood loss. Three different patents are implicated here.

ConMed is the owner by assignment of U.S. Patent No. 4,781,175 ("'175 patent"), issued in 1988. The '175 patent is directed at argon gas-assisted electrosurgical products used in argon beam coagulation ("ABC"), where the gas molecules move substantially parallel to one another long enough to strike the target tissue. It discloses an electrosurgical instrument that aims a directed, laminar stream of argon gas. '175 patent col.8 ll.10–14.

Dr. Canady is the named inventor of U.S. Patent No. 5,207,675 ("'675 patent"), issued in 1993, and is Canady Technology's founder, CEO, and partial owner. The '675 patent discloses a "surgical tissue coagulator" that includes a "flexible tube" with a handle that is used to maneuver the tube within an endoscope for argon gas-assisted electrosurgery.[1]

ERBE is the owner by assignment of the '745 patent, issued in 1998. The '745 patent was filed in 1995 as Continuation-in-Part Application Serial No. 08/579,879

---

[1] The '675 patent is not directly at issue here, but is relevant prior art.

("'879 CIP") of U.S. Patent Application Serial No. 981,009 ("'009 application") from 1992. The '879 CIP application added forty-eight new claims and disclosures of argon gas rates and a not directed, non-laminar stream of argon gas. The patent examiner issued an Office Action, dated March 28, 1997, rejecting nearly all of the pending claims as indefinite and obvious in light of the prior art. J.A. 1068–77. The examiner noted that the Canady '675 patent disclosed argon flow rates ranging from 1 to 12 liters per minute, but did not disclose argon flow rates of "less than 1 liter per minute." J.A. 1073. On June 27, 1997, in response to that Office Action, the applicants filed an amendment to overcome the deficiencies in which it argued for the patentability of its pending claims over the Canady '675 patent because of the invention's claimed low gas flow rate. J.A. 1088–99. The examiner then issued its notice of allowance of the '745 patent. The '745 patent is directed to electrosurgical systems and methods for coagulating biological tissue with a high frequency current using argon plasma, i.e., ionized argon gas, through flexible endoscopic probes. This is known as argon plasma coagulation ("APC").

ERBE unsuccessfully tried to register the color blue as applied to these "flexible endoscopic probes for use in argon plasma coagulation" on the U.S. Patent and Trademark Office's ("PTO's") Principal Register. J.A. 3848–59. Thereafter, in 2002, ERBE did register the color blue as applied to the tube portion of the APC probes on the PTO Supplemental Register as U.S. Trademark Registration No. 2,637,630 ("'630 trademark"). J.A. 3846.

The patents have been the subject of a variety of litigation since their issuance. First, Dr. Canady sued ERBE in the United States District Court for the District of Columbia for infringement of the '675 patent in 1996

based on ERBE's importation of its APC probes. The district court held that the accused ERBE APC probes do not infringe the '675 patent because they do not have handles. This court affirmed. During the pendency of that action, in 2005, Dr. Canady also sued ERBE in the United Kingdom ("U.K.") on its European foreign counterpart to the '675 patent, European Patent No. 0595967. J.A. 2480–97. The U.K. court similarly found no infringement because of the absence of handles in the ERBE APC probes and ordered Dr. Canady to pay ERBE's attorneys fees.

Meanwhile, in 2000, ConMed granted ERBE a non-exclusive license to manufacture products under the '175 patent, such as argon gas-enhanced electrosurgical generators and flexible probes, in consideration for specified royalty payments. Under this agreement, ERBE also received the right to sue for infringement of the '175 patent.

Also in 2000, ConMed filed a lawsuit against ERBE in the United States District Court for the Northern District of New York, seeking a declaratory judgment that the '745 patent was invalid and that ConMed's ABC probes did not infringe the '745 patent. ERBE answered that the asserted patent was valid and infringed. In 2003, upon motion for summary judgment by ConMed, the district court construed the claims of the '745 patent and found that ConMed's ABC probes did not infringe. ERBE appealed, but in accordance with a subsequent settlement agreement, the district court vacated its summary judgment decision upon remand from this court. Under the settlement agreement, ERBE granted ConMed a non-exclusive license allowing ConMed to continue selling its ABC probes.

In 2005, Dr. Canady contracted with KLS Martin GmbH & Co. ("KLS Martin") to manufacture blue 2.3 mm diameter probes ("Canady probes") with black range marking rings along the tip end. In that year, Canady also filed a 510(k) application with the U.S. Food and Drug Administration ("FDA") seeking approval to sell the Canady probes, which operated with ERBE APC generators to perform APC procedures. After receiving approval, Canady Technology began importing and selling the accused Canady probes that it identified as substantially similar to ERBE APC probes, having the same uses, color, and marking rings, to customers of the ERBE APC systems in the United States. In 2006, ERBE filed a complaint with the International Trade Commission ("ITC"), which initiated an investigation of Canady Technology and KLS Martin. The ITC determined that ERBE did not present evidence of direct infringement by Canady customers under the proper construction of the asserted claims, and therefore Canady could not have engaged in contributory or induced infringement. We affirmed the ITC decision in *ERBE Elektromedizin GmbH v. International Trade Commission*, 566 F.3d 1028 (Fed. Cir. 2009).

In addition, on December 5, 2005, ERBE and ConMed brought the instant action against Dr. Canady and Canady Technology. ERBE and ConMed filed an amended complaint alleging, inter alia, contributory infringement and infringement by inducement of the '745 and '175 patents based on Canady Technology's flexible endoscopic argon gas-assisted electrosurgical probes. ERBE also alleged infringement of '630 trademark under Section 32 of the Lanham Act, 15 U.S.C. § 1114, because of the blue color on the Canady probes. Based on its purported trade dress, consisting of the blue tube with black markings at the end, ERBE further asserted a claim for unfair competition in violation of Section 43(a) of the Lanham Act, 15

U.S.C. § 1125. Canady denied all of plaintiffs' claims and asserted, inter alia, antitrust counterclaims against ERBE and ConMed under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

The district court held a *Markman* hearing and construed the '745 patent's disputed claim terms, including "low flow rate," which appears in independent claims 1 and 35 and dependent claim 38 of the '745 patent. *ERBE Elektromedizin GmbH v. Canady Tech., LLC*, 512 F. Supp. 2d 297 (W.D. Pa. 2007) (claim construction order). Claim 1 recites that the "gas flows from the source, through the tube and exits through the opening at the distal end of the tube *at a low flow rate of less than about 1 liter/minute.*" '745 patent col.11 ll.40–43 (emphasis added). Claim 35 states that "supplying the inert gas from the source of said gas through the tube to the distal end opening of said tube with such a *low flow rate*, that gas exiting through said distal end opening is a *not directed, non laminar stream* but forms an inert gas atmosphere." *Id.* col.15 ll.52–57 (emphases added). Dependent claim 38 recites, "[t]he method as claimed in claim 35, whereby the stream of gas exits through said distal end opening with a *flow rate of less than about one liter per minute.*" *Id.* col.16 ll.21–23 (emphasis added).

Both parties submitted a single definition for the construction of the disputed term "low flow rate" appearing in claims 1 and 35. ERBE proposed "a flow rate that causes the gas exiting through the opening at the distal end of the flexible tube to be a not directed, non laminar stream that forms an inert gas atmosphere." Canady proposed that the term means "much smaller than one liter per minute and producing flow velocities less than 19 km/hour." After considering the claim language, the specification, and the prosecution history, the court

construed the disputed claim term "low flow rate" to mean "a rate of flow less than about 1 liter/minute and producing flow velocities less than 19 km/hour such that the gas exiting through the distal end opening forms a non-laminar inert gas temperature." *ERBE*, 512 F. Supp. 2d at 309. As the court explained, in the March 28, 1997 Office Action, the examiner rejected ERBE's amended claims based on two prior art references, one being Canady's '675 patent. J.A. 1073. ERBE responded to that action arguing for patentability based on the "low flow rate" being less than 1 liter per minute and producing a flow velocity of less than 19 m/hr. J.A. 1089. When ERBE failed to respond to Canady's argument that this was a prosecution disclaimer, the court determined that ERBE indeed distinguished and thus disclaimed the 1 to 12 liters per minute flow rates disclosed in the prior art to obtain the '745 patent.

The district court then granted Canady's motion for summary judgment of non-infringement as to the asserted claims of the '745 patent. Based on the court's construction of the disputed claim term "low flow rate," ERBE could not show direct infringement because ERBE failed to present evidence that the accused Canady 2.3 mm probes exhibited argon flow velocities less than 19 km/hr. *ERBE Electromedizin GmbH v. Canady Tech., LLC*, 529 F. Supp. 2d 577, 599 (W.D. Pa. 2007) (summary judgment opinion).[2] In the alternative, the court found summary judgment proper as to ERBE's contributory infringement claim because ERBE failed to raise a genuine issue of material fact that the accused Canady probes lacked substantial non-infringing uses. The court also granted Canady's motion for summary judgment with

---

[2]    In this citation, ERBE Elektromedizin GmbH was spelled ERBE Electromedizin GmbH.

respect to ERBE's trademark and trade dress claims because ERBE failed to establish a genuine issue of material fact that the blue color and black markings were nonfunctional and the trademark and trade dress acquired secondary meaning. After the court denied Canady's motion for summary judgment of non-infringement of ERBE's and ConMed's '175 patent infringement claims and set them for trial before a jury, the parties settled and jointly moved to dismiss the claim.

Finally, the district court granted ERBE's and Con-Med's motions for summary judgment as to Canady Technology's antitrust counterclaims. The court determined that Canady failed to raise a genuine issue of material fact that the instant action was a sham excepting ERBE and ConMed from immunity under the *Noerr-Pennington* doctrine.

The district court denied the parties' motions for reconsideration and entered final judgment on May 9, 2008. ERBE timely appeals and Canady Technology cross-appeals. We have jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

On appeal, ERBE challenges the court's construction of certain disputed claim terms and subsequent grant of summary judgment of non-infringement as to the asserted claims of the '745 patent. ERBE also objects to the court's grant of summary judgment as to its '630 trademark and trade dress claims. In its cross-appeal, Canady Technology contests the court's grant of summary judgment as to its antitrust counterclaims against ERBE and ConMed. We address each challenge in turn.

I

We first address ERBE's challenge to the court's construction of certain disputed claim terms in the '745 patent and subsequent finding of non-infringement.

As a preliminary matter, Canady asserts that ERBE waived its right to challenge the district court's grant of summary judgment of non-infringement because ERBE did not contest the court's alternative holding that the accused products have substantial non-infringing uses. The problem with Canady's waiver argument, however, is that the district court's alternative holding only implicates the contributory infringement claim, which requires a successful plaintiff to prove that the accused product has no substantial non-infringing uses. *See* 35 U.S.C. § 271(c). No such requirement, however, exists for induced infringement. *See id.* § 271(b). Therefore, ERBE did not have to challenge the court's alternative ground to avoid waiving its right to appeal the court's judgment of non-infringement with regard to its inducement of infringement claim.

Turning to the merits of the '745 patent infringement claim, on appeal ERBE takes issue with the court's construction of the disputed claim term "low flow rate" arguing that it violates several canons of claim construction. Specifically, ERBE submits that by construing "low flow rate" to mean "a rate of flow less than 1 liter/minute and producing flow velocities less than 19 km/hr such that the gas exiting through the distal end opening forms a non-laminar inert gas temperature," the court failed to give the term its ordinary and customary meaning, ignored the doctrine of claim differentiation, assumed disclaimers, and erroneously imported quantitative limitations. Canady responds that the court properly construed this

claim term in light of the intrinsic evidence, namely the claim language, the patent specification, and the prosecution history. We agree with Canady.

Claim construction is a question of law that is reviewed de novo. *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326 (Fed. Cir. 2007). We begin our claim construction analysis with the words of the claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim terms are generally construed in accordance with the ordinary and customary meaning they would have to one of ordinary skill in the art. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. In addition to considering the specification, courts should consider the relevant prosecution history of an asserted patent. *Id.* at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of the prosecution, making the claim scope narrower than it would otherwise be." *Id.* Mindful of these principles, we turn to the disputed claim term "low flow rate."

We begin with the claim language. Notably, though both claims 1 and 35 contain the term "low flow rate," claim 1 describes it as being "less than about 1 liter/minute," '745 patent col.11 ll.42–43, while claim 35 explains it is "a not directed, non laminar stream." *Id.* col.16 ll.14. In their *Markman* briefs, however, the parties submitted one, albeit different, definition for "low flow rate." The specification explains that directed gas

flow could injure the patient. The invention sought to overcome this problem by disclosing and claiming low argon gas flows that produce a low, not directed, non-laminar stream of gas exiting the tube. The specification further provides an exemplary flow rate of about less than 1 liter per minute.

ERBE asserts that the specification's exemplary flow rates are not quantitative limitations and cannot be imported into the claims because the specification uses a clear qualitative description for the term "low flow rate." ERBE similarly contends that the court's construction erroneously imports a "19 km/hr" limitation from the prosecution history into claims 1 and 35. According to ERBE, the prosecution history here does not limit the invention because there is no express disclaimer. In the alternative, ERBE argues that any disclaimer during prosecution was only qualitative and related to high flow rates. For support, ERBE directs this court to the specification's explanation of the '175 prior art reference where the laminar jet can be directed to the tissue to be coagulated with a gas flow rate "sufficient to clear natural fluids from the tissue." *Id.* col.6 ll.26–31.

We reject ERBE's arguments based on the language of claim 1, the specification, and the prosecution history. The inventors distinguished its low flow rate from the Canady '675 patent prior art reference in order to obtain its invention. Specifically, the patent examiner issued a March 28, 1997 Office Action rejecting the pending claims as obvious in light of Canady's endoscopes "disclos[ing] the use of very low flow rates (i.e. about 1 liter per minute) . . . [where t]he specific flow rate may be adjusted from 1-12 liters per minute . . . [but not] less than 1 liter per min." J.A. 1073. On June 27, 1997, patent applicants responded to that Office Action describing the invention's

"low gas flow rate, which allows the area of the tissue being treated to be surrounded by the plasma atmosphere." J.A. 1088. Applicants explained that the claimed flow rate avoids the production of laminar jets to prevent patient injuries. J.A. 1089. Specifically, they stated:

> This flow rate avoids the production of laminar jets of ionized gas directed with high impact onto the tissue. The problems of laminar jets are to be avoided, since the ionized gas can enter the bloodstream and have toxic effects on the patient. According to Canady [the '675 patent], column 4 lines 3-5, a flow rate of 1 to 12 litres per minute is foreseen there. Taking the outer diameter of the tube to be 3 mm (column 2, line 68) would lead to an inner diameter of the tube of about 2 mm. This corresponds to a cross-section of 3.14 mm. A flow rate of 1 litre per minute leads to a flow velocity of 19 m/h. Taking the higher value of 12 litres per minute gives an outlet gas speed of 229 km/h. *Such velocities* in Canady would certainly be classified as laminar jets and would likely lead to the above problems.

*Id.* (footnote omitted) (emphasis added). After the inventors distinguished the flow rates of 1 to 12 liters per minute disclosed in the Canady '675 patent—whose disclosed tubes produced flow rates of 1 to 12 liters per minute leading to laminar jet gas flow velocities of 19 m/h to 229 km/h—the examiner issued its notice of allowance of the amended claims in the application.

We do not agree with ERBE that "such velocities" referred to the "229 km/h" alone. Oral Argument 6:04-37, *http://oralarguments.cafc.uscourts.gov/mp3/2010-1425.mp3.* As Canady's counsel explained, such a reading

is illogical. The examiner had rejected the pending claims with a low flow rate in light of the prior art until the applicants distinguished their invention. The examiner would not have allowed an otherwise unpatentable invention based on the higher of the two numbers in the range set forth in the prior art. Rather, the prosecution history clearly and unambiguously demonstrates that the applicants unequivocally disclaimed flow rates from 1 to 12 liters per minute that lead to "such velocities" of 19 through 229 km/h disclosed in the '675 patent prior art reference, referred to by applicants as laminar jets. Accordingly, as the district court concluded, the claimed flow rates were limited to less than 1 liter per minute and produced velocities less than 19 km/hr, which avoided the production of laminar jets and produced only non-laminar, inert gas atmospheres.

Further, we are not persuaded by ERBE's argument that the district court's construction improperly reads the narrow quantitative claim limitation of dependent claim 38 into broader claim 35, resulting in the two claims having the same scope in violation of the canon of claim differentiation. ERBE's argument that the court's construction improperly renders the express limitation "less than about 1 liter/minute" in claims 1 and 38 mere surplusage is also unavailing.

Generally, "[a]ll the limitations of a claim must be considered meaningful." *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) (citing *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33 (Fed. Cir. 1987)). However, "no canon of [claim] construction is absolute in its application." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Claim differentiation may be helpful in some cases, but it is just one of many tools used by courts in the

analysis of claim terms. *See, e.g., Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1142–43 (Fed. Cir. 2005). Similarly, surplusage may exist in some claims. *See, e.g., Pickholtz v. Rainbow Tech., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002). As we have stated, "[a]ll rules of construction must be understood in terms of the factual situations that produced them, and applied in fidelity to their origins." *Modine Mfg. Co. v. U.S. Int'l Trade Comm.*, 75 F.3d 1545, 1551 (Fed. Cir. 1996).

We thus reject ERBE's arguments with respect to "claim differentiation" and "surplusage." In this case, the prosecution history establishes that the Canady prior art patent was distinguished based on this "low flow rate" limitation and thus this term as it appears in the asserted claims is limited. *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366–67 (Fed. Cir. 2007) (concluding arguments distinguishing the prior art patent suggested meaning of disputed claim terms when applying *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995)); *Southwall Techs.*, 54 F.3d at 1579 ("[A]rguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary."). Because the inventors clearly and unambiguously disclaimed such flow rates that produced laminar jets and limited the claims to flow velocities less than 19 km/hr to overcome unpatentability, we agree with the district court's claim construction with respect to "low flow rate."

We review "a district court's grant of summary judgment without deference." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1372 (Fed. Cir. 2005). Summary judgment is proper if the record shows that there is no genuine issue of material fact, drawing all reasonable

inferences in favor of the nonmovant.  Fed. R. Civ. P. 56(c)(2); *see Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003).  The district court determined that ERBE failed to present evidence of direct infringement under the court's construction of "low flow rate."  ERBE does not contest that it failed to present evidence that the accused 2.3 mm Canady probes exhibit velocities less than 19 km/hr.  Because we affirm the district court's construction of "low flow rate" and there is no evidence that the accused probes infringe the asserted claims in the '745 patent, we also affirm the court's judgment of non-infringement.[3]

II

We next address ERBE's challenge to the district court's grant of summary judgment as to its trademark and trade dress claims based on the court's determination that the color blue is functional and has not acquired the requisite secondary meaning.  When reviewing Lanham Act claims, we look to the law of the regional circuit where the district court sits, here the Third Circuit.  *See Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1200 (Fed. Cir. 1994).  Our review of a district court's grant of summary judgment that a trademark and trade dress is not infringed is plenary.  *See id.* at 1196.  We review the evidence in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Federal Rule of Civil Procedure 56(c) requires the nonmoving party to adduce more than a mere scintilla of evidence in its favor, *id.* at 252, and that party cannot simply reassert factually unsupported allegations con-

---

[3]  In light of our conclusion on the construction of "low flow rate," we need not reach ERBE's challenge to the construction of other claim terms.

tained in its pleadings, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

The Third Circuit analyzes federal trademark infringement and federal unfair competition under identical standards. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000). To prove either Lanham Act violation, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *Id.* A mark is afforded trademark protection if it is descriptive and has acquired secondary meaning. *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008).

In this case, the examiner determined that ERBE could not register the color blue on its APC probes on the Principal Register because the color blue was ornamental and ERBE failed to show evidence of secondary meaning, whether competitors used the color for its products, and whether the color was functional. J.A. 3848–59. Thereafter, ERBE registered the mark on the Supplemental Register. J.A. 3846.

Federal registration on the Principal Register provides a presumption of the mark's validity. 15 U.S.C. §§ 1057(b), 1115(a). Registration of a mark on the Supplemental Register, however, does not. 15 U.S.C. § 1094. As § 1094 explains, marks registered on the Supplemental Register do not receive the advantages of §§ 1057(b) and 1115(a). Since the '630 trademark is on the Supplemental Register, and not the Principal Register, the parties agree that, under the authoritative statutory language and Third Circuit case law, ERBE bears the burden of proving that it owns a valid mark. *See* 15 U.S.C. § 1094; *E.T.*

*Browne Drug Co.*, 538 F.3d at 191 (explaining that the party seeking enforcement of trademark laws has the burden of proving the existence of a protectable trademark when the mark does not appear on the PTO's Principal Register); Def./Cross-Appellant Br. 34; Appellant Reply Br. 54.

On appeal, ERBE argues that the court improperly granted summary judgment on its trademark and trade dress claims because it misapplied the proper case law and failed to consider the evidence in the light most favorable to ERBE, the non-moving party. Specifically, ERBE contends that it proffered evidence that raises a genuine issue of material fact that the color blue is not functional for APC probes and that it has acquired secondary meaning. Canady responds that ERBE's conclusory and unsupported allegations do not preclude summary judgment in this case, where the uncontroverted evidence demonstrates that the color blue is functional and lacks secondary meaning.

To survive summary judgment here, ERBE would have to establish a genuine issue of material fact that both the color blue is non-functional *and* has acquired secondary meaning. *See, e.g.*, *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 166–67 (1995); *L.D. Kichler Co., v. Davoil, Inc.*, 192 F.3d 1349, 1352 (Fed. Cir. 1999); *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1445 (3d Cir. 1994). It fails to do either.

We first look to functionality. A mark is functional if it "'is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is,' if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *L.D. Kichler Co.*, 192 F.3d at 1352 (quoting *Qualitex*, 514 U.S. at 165).

Some factors courts use to determine functionality include whether the design yields a utilitarian advantage, alternative designs are available in order to avoid hindering competition, and the design achieves economies in manufacture or use. *See, e.g.*, *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1121 (Fed. Cir. 1985).

Color may not be granted trademark protection if the color performs a utilitarian function in connection with the goods it identifies or there are specific competitive advantages for use. *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1530–33 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995) (color black for outboard engines was functional and could not be protected where black offered the advantage of being compatible with a wider variety of boat colors); *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 824 (3d Cir. 1981). However, "[m]ere taste or preference cannot render a color—unless it is 'the best, or at least one, of a few superior designs'—*de jure* functional." *L.D. Kichler Co.*, 192 F.3d at 1353; *see Brunswick Corp.*, 35 F.3d at 1531 (explaining that de jure functional features, which rest on utility and the foundation of effective competition, are not entitled to trademark protection). The Third Circuit has explained that the policy behind the functionality doctrine invokes the inquiry of whether prohibiting the mark's imitation by others will deprive those others of something that will substantially hinder them in competition. *Keene*, 653 F.3d at 827. As a result, the existence of other, equally usable colors is relevant to determine whether a particular color is functional. *Qualitex*, 514 U.S. at 166.

ERBE asserts that there is a genuine issue of material fact whether the color blue is functional because the evidence demonstrates that blue is not uniquely superior for APC probes, has no competitive advantage because it

is not essential to the use or purpose of the APC probes, does not have an aesthetic function, and that many other colors are equally visible against human tissue and are available for selection. For support, ERBE offers the declaration of Managing Director Christian Erbe. In this declaration, Mr. Erbe explained that "[b]lue is one of the many colors available for APC probes. Any color, other than beige or red, would be clearly visible during endoscopic procedures." J.A. 4938.

We reject ERBE's argument that the district court misapplied *Keene*. In *Keene*, the Third Circuit explained that the "functionality doctrine stems from the public interest in enhancing competition" and avoiding improper hindrance of competition in the marketplace. 653 F.2d at 827. ERBE fails to present a genuine issue of material fact that the color blue does not make the probe more visible through an endoscopic camera or that such a color mark would not lead to anti-competitive effects. *Cf. In re Owens-Corning Fiberglas Corp.*, 774 F.2d at 1122 (holding that the color pink for fiber glass insulation was not functional because it did "not deprive competitors of any reasonable right or competitive need"). The evidence in the record is that the color blue is prevalent in the medical field, the blue color enhances identification of the endoscopic tip, and several companies use blue endoscope probes. *See, e.g.*, J.A. 3876 (Biosearch Medical Products Inc. advertisement explaining that "[b]lue color enhances positive Endoscopic identification of the tip."). There is no evidentiary support that other colors are as visible through an endoscopic camera as the color blue other than a conclusory, self-serving statement by Mr. Erbe. Because the record evidence demonstrates that appropriation by ERBE alone would place others at a competitive disadvantage, we conclude that the district court

properly found that there is no genuine issue of material fact that the color blue is functional.

Moreover, even if the color blue is non-functional, we would still affirm the district court's grant of summary judgment because ERBE fails to present a genuine issue of material fact that there is secondary meaning for the mark. A manufacturer may obtain trademark protection for a color mark where it acts as a symbol that distinguishes a firm's goods and identifies its source. *Qualitex*, 514 U.S. at 166. In considering whether there is secondary meaning, in that there is an association formed in the minds of the consumers between the mark and the source or origin of the product, the Third Circuit looks to the following non-exhaustive list of factors:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.

*E.T. Browne Drug Co.*, 538 F.3d at 199 (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d. Cir. 2000)).

On appeal, ERBE argues that the district court did not properly consider evidence that ERBE's trademark has secondary meaning. Specifically, ERBE directs us to Mr. Erbe's declaration for support that ERBE used this particular blue on its APC probes for several years in marketing materials, on giveaways at tradeshows, and ERBE advertised its slogan, "True Blue Probe for Argon Plasma Coagulation." J.A. 4938–39. Canady responds,

and the district court agreed, "that while ERBE may have been using the color blue for over 30 years, there is no evidence that, in the minds of the public, the primary significance of the color blue is to identify ERBE as the source of the product." *ERBE*, 529 F. Supp. 2d at 603. ERBE does not offer any evidence—such as sales and advertising leading to buyer association, customer surveys, customer testimony, the number of sales, the number of customers, the use of the mark in trade journals, or actual confusion—that creates a genuine issue of material fact with regard to whether the color blue on its flexible endoscopic probes has secondary meaning. *E.T. Browne Drug Co.*, 538 F.3d at 199. Indeed, ERBE failed to present any evidence that consumers associate the color blue on its flexible endoscopic probes with ERBE.[4] Viewing all of the evidence in the light most favorable to ERBE,

---

[4]    Further, as Canady argues, ERBE's only competitor, ConMed, has been using blue on its probes since January 2002. ERBE acknowledged that ConMed uses blue flexible endoscopic probes during the prosecution of the '630 trademark. J.A. 3862. There, ERBE noted that there was a pending lawsuit in the Northern District of New York against ConMed for "selling similar looking tubes as part of its flexible endoscopic probes for use in argon plasma coagulation, in apparent infringement of the '745 patent." *Id.* ERBE, however, admits that the '745 patent "does not disclose or claim the color blue for the tube portions of the probes." *Id.* ERBE does not demonstrate that the lawsuit in the Northern District of New York involved trademark or trade dress claims, or that the resulting settlement licensed this color blue to ConMed. ERBE also fails to present evidence that it licensed the '630 trademark to ConMed. Rather, the record evidence shows that at least one of ERBE's competitors, ConMed, uses blue flexible endoscopic probes for use in argon plasma coagulation and thus ERBE does not maintain exclusive use. *E.T. Browne Drug Co.*, 538 F.3d at 199.

ERBE fails to establish a genuine issue of material fact with respect to secondary meaning.[5]    Accordingly, we affirm the district court's grant of summary judgment as to ERBE's trademark infringement claims.

On appeal, ERBE generally refers to its "trade dress" claims, which includes the color blue of the APC probe with black rings at the end of the tube.  It is undisputed that ERBE's purported trade dress is not registered.  The district court granted summary judgment on these claims because ERBE failed to present any argument that the black rings at the end of the probe were non-functional. ERBE similarly fails to present any evidence relating to its trade dress claims on appeal.  We, therefore, also affirm the district court's grant of summary judgment as to ERBE's trade dress claims.

III

We now turn to Canady Technology's cross-appeal. The issue is whether the district court properly granted summary judgment on Canady Technology's antitrust counterclaims in favor of ERBE and ConMed.  Generally, when reviewing a district court's judgment involving federal antitrust law, we apply the law of the regional circuit in which that court sits.  *See C.S.U., L.L.C. v. Xerox Corp.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).  How-

---

[5]    The dissent does not identify any evidence that ERBE presents relating to the required association formed in the minds of consumers between the mark and the source or origin of the product.  The dissent further ignores the evidence demonstrating that at least one of ERBE's competitors uses blue flexible endoscopic probes—and thus the requisite secondary meaning is missing here.

ever, we apply our own law when resolving issues that involve our exclusive jurisdiction. *Id.*

Canady Technology first argues that the district court applied the wrong standard for determining whether the *Noerr-Pennington* doctrine immunizes ERBE and ConMed from antitrust liability. The *Noerr-Pennington* doctrine generally immunizes a party from antitrust liability based on its filing of a lawsuit unless the narrow "sham litigation" exception applies. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 56 (1998). In *PRE*, the Supreme Court explained that sham litigation is present where the lawsuit is objectively baseless and subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief. 508 U.S. at 60–61; *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998). Because *PRE*, however, only looks to whether a *single* lawsuit is a sham, two circuit courts have applied a different standard where there is a "whole series of legal proceedings." *Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994).

The dispute here is whether we should consider just the instant action or all prior litigation in determining whether the sham litigation exception applies to the *Noerr-Pennington* immunity doctrine. This dispute implicates two different lines of cases. Canady Technology urges us to follow the Ninth-Second Circuit precedent here because ERBE and ConMed have filed multiple lawsuits. On these particular facts, however, we need not determine whether to adopt the test of our sister courts because there is no "series" of legal proceedings. The other proceedings Canady Technology directs us to are

against Dr. Canady, as an individual, who is admittedly not asserting the antitrust counterclaims with Canady Technology.

In *Amarell v. Connell*, 102 F.3d 1494, 1519–20 (9th Cir. 1997), the Ninth Circuit held that only two lawsuits is not a "series" or "pattern" of litigation implicating the standard in *USS-POSCO* for "a whole series of legal proceedings." In this case, the three relevant lawsuits ERBE filed to which Canady Technology directs our attention are not "simultaneous and voluminous" and do not implicate a test for "a whole series of legal proceedings." *Cf. Primetime 24*, 219 F.3d at 101; *USS-POSCO*, 31 F.3d at 811. Therefore, like the district court, we analyze Canady Technology's antitrust counterclaims under the *PRE* sham litigation exception to the *Noerr-Pennington* immunity doctrine.

At oral argument, Canady's counsel conceded that if we analyze its antitrust counterclaims under *PRE*, summary judgment with respect to ConMed is appropriate. Oral Argument 24:11-32, *http://oralarguments.cafc.uscourts.gov/mp3/2010-1425.mp3*. So we are left now with only resolving Canady Technology's antitrust counterclaims relating to ERBE.

To prove that the instant action is a sham and the plaintiff is not entitled to immunity, the suit must be "both *objectively* baseless and *subjectively* motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy." *Nobelpharma*, 141 F.3d at 1071 (citing *PRE*, 508 U.S. at 60–61). We first look to whether the plaintiff had probable cause to institute the action. The existence of probable cause— e.g., where the law is unsettled, the action is arguably warranted by existing law, or there is an objectively good

faith argument for extending existing law—precludes a sham litigation finding. *PRE*, 508 U.S. at 62, 65. We shall only reach the litigant's subjective motivation if the challenged litigation is objectively meritless. *Id.* at 60.

Canady Technology argues that it has presented a genuine issue of material fact that ERBE's patent infringement, trademark, and trade dress claims were objectively baseless and warrant an exception to the *Noerr-Pennington* immunity doctrine. Specifically, Canady Technology argues that no reasonable person could have expected success on these claims. We disagree.

The record demonstrates that ERBE had probable cause to bring this patent enforcement litigation. As evident from our claim construction analysis in Section I, *supra*, Canady Technology fails to present a genuine issue of material fact that ERBE's '745 patent infringement claim was so objectively "baseless that no reasonable litigant could realistically expect to secure favorable relief." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1583 (Fed. Cir. 1993) (quoting *PRE*, 508 U.S. at 62)). Although ERBE's arguments were not winning ones, our analysis demonstrates that ERBE presented non-frivolous arguments for its proposed construction of the disputed claim term "low flow rate." Merely because our construction of this term is the same as that of the vacated decision of the Northern District of New York, this does not create a genuine issue of material fact that ERBE's instant suit was objectively baseless. Therefore, the "sham litigation" exception to the *Noerr-Pennington* doctrine is not warranted here.

Canady Technology also argues that the district court improperly failed to consider whether ERBE's alleged predatory acts other than sham litigation violated anti-

trust law.    The other alleged predatory acts include interfering with and inhibiting the development and marketing of dual mode argon probes, and interfering with Canady Technology's contracts and business expectations.  Canady Technology blames ERBE for its failure to present any genuine issue of material fact with respect to these allegations.  Specifically, Canady Technology contends that "ERBE elected to forego the discovery process rather than using it to more clearly define the issues and evidence."  Def./Cross-Appellant Br. 41.  Canady Technology, however, has it backwards.  It is Canady Technology, and not ERBE, who bears the burden of seeking discovery on its antitrust claims and establishing some genuine issue of material fact as to the other predatory acts it argues the district court ignored.  Canady Technology failed to do either.

Sections 1 and 2 of the Sherman Act protect against unreasonable restraints of trade and monopolization of trade or commerce.  15 U.S.C. §§ 1, 2.  To survive summary judgment, plaintiff must show, inter alia, illegal action and antitrust injury.  Canady Technology fails to show that ERBE engaged in illegal activity resulting in prohibited antitrust injury.  Rather, Canady Technology concedes that the warranties ERBE purportedly would "void" or "not honor" had already expired.  On this record, we conclude that ERBE fails to establish a genuine issue of material fact that ERBE engaged in predatory acts in violation of antitrust law that preclude summary judgment.  Therefore, we affirm the district court's grant of summary judgment on Canady Technology's antitrust counterclaims.

CONCLUSION

For the reasons set forth above, we affirm the district

court's grant of summary judgment of non-infringement as to ERBE's '745 patent infringement claim, and summary judgment of ERBE's '630 trademark and trade dress claims based on functionality and lack of secondary meaning.  We also affirm the district court's grant of summary judgment of Canady Technology's antitrust counterclaims.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**ERBE ELEKTROMEDIZIN GMBH AND ERBE USA, INC.,**
*Plaintiffs-Appellants,*

**and**

**CONMED CORPORATION,**
*Plaintiff-Appellee,*

v.

**CANADY TECHNOLOGY LLC, AND DR. JEROME CANADY,**
*Defendants-Cross Appellants.*

---

2008-1425,-1426

---

Appeals from the United States District Court for the Western District of Pennsylvania in Case No. 05-CV-1674, Chief Judge Donetta W. Ambrose.

---

NEWMAN, *Circuit Judge*, concurring in part, dissenting in part.

I respectfully dissent from the grant of summary judgment whereby the court holds, summarily, that there can be neither patent nor trademark nor trade dress infringement

of ERBE's proprietary rights. I write separately with respect particularly to the trademark and trade dress issues, for the court has departed from established law and precedent. Canady does not dispute that it copied the blue color and the particular shade of blue of the ERBE probe; that is, that it copied the trade dress. The public interest in avoidance of deception or confusion looms particularly large in the medical/surgical field, where the surgeon's experience of quality and performance, on recognition of the surgical device by its unique color, is a matter of public concern.

Common law property rights are of practical significance, and their sustenance is as much a judicial responsibility as are statutory rights. This court's cursory authorization to a competitor to copy the distinctive color of this surgical probe, despite the evidence of likelihood of confusion as to the source and identity of the probe, is surely not subject to summary disposition in favor of the copier. ERBE suggests that there is deception and free-riding, for it was not disputed that the blue probes with black markings, manufactured by KLS Martin GmbH & Co. and imported by Canady for use with the ERBE equipment, are intended to mirror the blue color and black markings of the ERBE probes. Canady represented to the FDA that its imported probes are "the same as" the ERBE probes, and obtained expedited FDA approval based on that representation. Indeed, Canady's probes are compatible only with ERBE's electrosurgical equipment.

The district court held, on summary judgment, that the blue color is "functional." However, ERBE established at least a genuine issue as to this question. Registration of the blue color for these products on the Supplemental Register required the applicant to show that the color is not functional. Trademark Manual of Examining Procedure §1202.05(b) states:

> A color mark is not registrable on the Principal Register under §2(f), or the Supplemental Register, if the color is functional. *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), *cert. denied,* 514 U.S. 1050 (1995); *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417 (Fed. Cir. 1985).

Thus the color mark passed the test of non-functionality, upon agency examination.

The difference with respect to registration of a color on the Supplemental Register and the Principal Register does not relate to functionality, but to the need to establish secondary meaning for the particular color. Non-functionality does not of itself establish secondary meaning. *See In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985) (criteria for registration on the Principal Register of the color pink for fiberglass insulation material); *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 166 (1995) (holding that the existence of other, equally usable colors is relevant to whether a particular color is functional). In *Qualitex* the Court explained that a mark is functional "'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." 514 U.S. at 165 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).

In accordance with the review procedures of the Administrative Procedure Act, the holding of the Patent and Trademark Office of non-functionality of the color blue for "flexible endoscopic probes for use in argon plasma coagulation," receives administrative deference. Although ERBE had not obtained registration on the Principal Register,

ERBE was not required to do so in order to rely on its Supplemental registration for its statutory benefits, as well as to assert its common law trademark and trade dress rights, *see Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000) (holding that a product's unregistered trade dress in the form of product design is protectable upon a showing of secondary meaning).

The district court improperly granted summary judgment on the trademark and trade dress issues. Precedent does not support this judgment. Canady's argument that blue, this shade of blue, is the only color that can be distinguished from body fluids was directly contradicted by the expert declaration of Christian Erbe, Chairman of ERBE, USA, who declared that "Blue is one of many colors available for APC Probes. Any color, other than beige or red, would be clearly visible during endoscopic procedures." Decl. of Christian O. Erbe ¶4, July 17, 2007 (J.A. 4938). At the summary judgment stage, the factual issue of whether blue, or this shade of blue, is the only color of the spectrum that contrasts with bodily fluids was fairly placed into dispute. For this factual question to be decided in favor of Canady at the summary judgment stage, Canady must establish that it is entitled to judgment in its favor, even on ERBE's factual position. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

My colleagues criticize Mr. Erbe's declaration as "conclusory," Maj. Op. 20. However, his statement about the visibility of other colors is straightforward and in accord with common sense, and its correctness is unchallenged by Canady. The evidence offered by Canady in support of functionality is that one company advertises that its coagulation probe's "blue color enhances positive endoscopic

identification of the tip." This advertisement was cited by the PTO during examination, and registration on the Supplemental Register was nonetheless granted. A reasonable jury could decide—as did the PTO—that the color blue for argon plasma coagulation tubes is not functional, and is capable of serving as a trademark.

The court also errs in its summary judgment that ERBE cannot establish secondary meaning. In addition to the evidence of copying of the blue color, Mr. Erbe declared:

> 5. ERBE has advertised and promoted the Blue Probe Mark in various marketing materials including brochures, giveaways at tradeshows and through use of the TRUE BLUE PROBE FOR ARGON PLASMA COAGULATION mark, Registration No. 2,852,359, which issued on June 15, 2004.
>
> 6. The color of the ERBE APC probes ("ERBE Blue") is the corporate color of ERBE Elektromedizin GmbH. ERBE has used ERBE blue as part of its corporate identity, as part of its trade dress for medical devices, for various promotional items and in its literature and advertisements for more than thirty (30) years.

Decl. of Christian O. Erbe ¶¶5–6, July 17, 2007 (J.A. 4938).

As to copying, which the majority acknowledges in its list of factors relevant to secondary meaning but does not discuss, ERBE raises significant issues of possible passing off and consumer deception. The laws of trademark and trade dress are designed to protect the consumer as well as the purveyor. It does not serve the consuming public to eliminate legal protection of indicia of source and quality. *See Qualitex*, 514 U.S. at 164 ("The law thereby 'encour-

age[s] the production of quality products,' and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." (internal citation omitted)).

ERBE states that its blue color serves to protect the consumer/user, for it is a conspicuous identification of its particular probe for argon plasma coagulation. ERBE states that of the many colors that could be used, Canady selected the ERBE shade of blue for the sole purpose of profiting from the reputation established for ERBE's product. The panel majority discounts this unrebutted evidence, and observes only the absence of other possible types of evidence relating to secondary meaning. However, the Third Circuit, like other circuits, does not set rigid rules for all forms of trademark and trade dress. *See E.T. Browne Drug Co. v. Conocare Prods. Inc.*, 538 F.3d 185, 200 n.15 (3d Cir. 2008) ("We do not suggest that a party attempting to establish secondary meaning always must show that marketing materials succeeded in creating buyer association or that the term contributed to sales growth.").

My colleagues state that there is "evidence . . . that the color blue is prevalent in the medical field . . . and several companies use blue endoscope probes," Maj. Op. 20, apparently drawing this conclusion from the advertisement considered by the PTO and plaintiff ConMed's authorized blue probe. Whether secondary meaning was established is a question of fact, not subject to adverse inferences on summary judgment. The factual issue of likelihood of confusion, upon the undisputed intentional copying of this shade of blue, must be considered. ERBE has created at least a genuine issue of material fact as to whether its trade dress, as well as its trademark, is protectable. My col-

leagues err in finding these facts adversely, on summary judgment.

The judicial obligation is more complex than simply to facilitate "competition," as the panel majority asserts. The avoidance of deception of the consumer is a purpose of trade dress law. At the summary judgment stage, ERBE provided sufficient evidence to negate the movant's arguments with respect to the functionality and distinctiveness of its trade dress. Summary judgment that ERBE has no protectable right in its blue endoscopic argon probe was improperly granted. From my colleagues' contrary holding, I must, respectfully, dissent.