This Opinion is a
Precedent of the TTAB

Mailed: August 17, 2017

## UNITED STATES PATENT AND TRADEMARK OFFICE

————

## Trademark Trial and Appeal Board

————

*In re Keep A Breast Foundation*

————

Serial No. 85316199

————

Sean Flaherty of Coast Law Group for Keep A Breast Foundation.

Marlene Bell, Trademark Examining Attorney, Law Office 118
  (Thomas G. Howell, Managing Attorney).

————

Before Zervas, Cataldo and Kuczma,
  Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Keep a Breast Foundation ("Applicant") has applied to register the design shown

below on the Principal Register as a mark for

> Association services, namely, promoting the interests of communities
> and organizations in the field of breast cancer prevention and
> awareness, and of providers of educational services in the field of the
> causes of breast cancer; promoting public awareness of breast cancer
> prevention in International Class 35;
>
> Charitable fundraising services in International Class 36; and
>
> Educational services, namely, conducting seminars, art exhibitions, and
> workshops in the field of breast cancer awareness, causes, research and
> treatment; and entertainment services, namely, live musical

performances to promote breast cancer awareness, causes, research and treatment in International Class 41.[1]



The proposed mark is described in the application as follows:

> The mark consists of a three-dimensional cylindrical cast of female breasts and torso constituting a trade dress display akin to packaging, used in conjunction with the services offered. The shading in the drawing does not represent color, and is not a claimed feature of the mark. Shading is meant merely to show depth and dimension.

> Color is not claimed as a feature of the mark.

The application is based on an allegation of first use anywhere in October 1999 and first use in commerce in April 2000 for all classes of services. During prosecution, Applicant submitted a claim, in the alternative, that the proposed mark has acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).

The Trademark Examining Attorney finally refused registration as to all three classes of services on four grounds:

> (1) under Sections 1, 2, 3, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053 1127, on the ground that Applicant's design fails to function as a service mark;

---

[1] Application Serial No. 85316199 was filed on May 9, 2011 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a).

(2) under Sections 1, 2, 3 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053, 1127, on the ground that the proposed mark consists of nondistinctive trade dress that would not be perceived as a service mark, but merely as decoration or ornamentation;

(3) under Section 2(f), 15 U.S.C. § 1052(f), on the ground that Applicant did not make a sufficient evidentiary showing of acquired distinctiveness; and

(4) under Sections 1 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1127, on the basis that all of the specimens of record are unacceptable because they either fail to show the mark in the drawing or show the proposed mark but do not associate it with the identified services.

Applicant then appealed. Briefs have been filed.[2]

## I.  Examining Attorney's Evidence

In maintaining the refusals to register, the Examining Attorney submitted, *inter alia*, images from the Google search engine of breast, torso and body casts from numerous unspecified sources.[3] The following example is illustrative:

---

[2] Applicant's motion (21 TTABVUE) to extend its time in which to file its reply brief was granted by Board order (22 TTABVUE). However, from the record it does not appear that Applicant submitted a reply brief.

Exhibits A-C to Applicant's appeal brief (15 TTABVUE 30-41) were previously made of record during prosecution and are discussed *infra*. Accordingly, their attachment to Applicant's brief is redundant and unnecessary. *See, e.g.*, *In re SL&E Training Stable Inc.*, 88 USPQ2d 1216, 1220 n. 9 (TTAB 2008). Exhibits D-F (15 TTABVUE 42-50) were not introduced into the record during prosecution and are untimely. Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d). Accordingly, they will be given no consideration.

[3] October 30, 2013, Office action, Trademark Search and Document Retrieval (TSDR) p. 2-13.



The Examining Attorney further made of record screenshots from third-party informational and commercial Internet websites discussing and offering breast and body casting products and services, some of which are specifically directed toward breast cancer awareness and other issues related to breast cancer.[4] The following examples are illustrative:

---

[4] *Id.* at TSDR 14-22, 34-60; June 16, 2014, Office action, TSDR p. 2-21.

**Serial No. 85316199**



# Breast-casting event promotes cancer awareness and healthy body image



Share
Tweet 2
+1 0
Pin it
Like 6 Send

Details

Created on Wednesday, 31 October 2012 01:21
Written by Rachel Sluss
Hits: 795

Kent State University Stark Campus hosted its third annual Breast/Chest Casting event Tuesday from noon to 6 p.m.

Breast casting takes place across the country, but organizer Katrina Bloch brought the idea to Kent State Stark. The campus has used the event to raise awareness during Breast Cancer Awareness month.



Both women and men were encouraged to come to the casting to make a plaster mold of their chests. Each participant brought a buddy into the private room to help create the replica. The process involved dipping plaster strips into warm water and placing them over the bare chest. It took approximately 30 minutes to complete the mold.

Participants could either have their mold placed on a display in the Fine Arts Building or take it home. This event raised awareness about breast cancer and promoted openness about the human body.

"There are images everywhere that tell us we should look unreal," Bloch said. "This is to show that we should not be ashamed of our bodies. It's meant to foster appreciation instead."

Bloch said she knew of one person who was a victim of breast cancer that casted her breast. She was appreciative of women and men raising awareness for victims in such a bold way.

Donna Pugh, Kent State alumnus, signed up to take part in the breast casting for the first time.

Plaster casts of volunteer's chests during the breast cancer awareness event at Kent State

"I think the whole body is awesome," Pugh said. "I love when it's praised in a



## 1 in 8: The Torso Project



"1 in 8: The Torso Project" Exhibit at Artspace, Greenfield, MA

*1 in 8: The Torso Project is a collaborative art project that seeks to foster healing and public awareness. The title derives from cancer statistics: one in eight women, over the course of their lifetimes, will be diagnosed with breast cancer.*

Originated by 17-year breast cancer survivor and Forest Moon Program Director, Pam Roberts, the women make plaster of Paris casts of their own torsos to comment on the female form and to express outrage at the breast cancer epidemic, which kills one woman every 13 minutes. This year over 210,000 women will be diagnosed with breast cancer in the United States alone; over 40,000 will die.

**Writing Our Way Through Cancer Blog**

- Survivor Geometry
- The Truth Is
- New Blog Post: Forest Moon
- A Question – by Peggy Outcalt
- A poem from a recent participant
- I Remember a Day/The Thing Is
- Some Way to Live
- The Diagnosis

**Testimonials**

loading...



# PINK WELL CHALLENGE FINALIST PROFILE: BREAST IMPRESSIONS, INC.



BY PINK WELL
03.12.12

Breast Impressions mission is to increase breast cancer awareness and fundraising to support breast cancer education, prevention and treatment. Breast Impressions also donates breast casting kits to women who have recently been diagnosed with breast cancer, and would like to make a memory prior to surgery. Breast Impressions is a 501(c) (3) Non-Profit Organization.

We have two great accomplishments that just keep gaining momentum year after year. Many women who have received our donated casting kits to make a memory share their pictures with us,

and most importantly share with us how it helped in their healing. We then feature these inspiring women in our annual breast cancer survivor calendar which in turn helps others. Our second greatest accomplishment would be the amount of funding we have provided to small community breast cancer outreach and projects through the auction of our beautiful breast cast art.

Breast Impressions knows that making a memory has helped hundreds of women in their healing through breast cancer. We know more women would want to take advantage of our program if they knew about it. We are always looking for new ways to spread the news about our program.

Breast Impressions funding comes solely from individuals and the sale of our beautiful breast cancer survivor's calendar. 100% of the art auctions go to other breast cancer charities because we are a vehicle for their support. We would use the funds to underwrite the cost of printing our calendars so all money raised through calendar sales would be used to make our breast casting kits, allowing us to reach more women.

Making a memory with a donated breast cast can reach many more people we ever imagine. Gladys, age 86 wanted to make the memory for her granddaughter to remember her by as she wasn't going to undergo treatment. Her bridge club helped make her memory cast, but we were contacted by her granddaughter eight months later to say Gladys had passed away. She shared the cast was displayed at the funeral, and all those who saw it made a commitment to do their monthly breast self exams and get mammograms annually. Gladys is raising awareness even after her passing.

**Serial No. 85316199**

# BREAST OF ART

FUNDRAISER FOR BREAST CANCER 16TH OCTOBER

Home    About the event    Breast Cast Info    Participating Stores    Sponsors    Stories

Visual Artists

## Breast Cast Info

Thank you so much for your interest in making your own breast cast and help us raise money for a good cause.

We encourage you to sponsor your breast cast and to ask your friends to submit donations. Our main goal is to raise money for the ............ We appreciate your commitment to help out and to donate your breast cast to charity. All breast casts will be auctionned off and will remain anonymous. We also encourage you to submit your stories (reasons your are doing this on our Facebook page) and we will feature some of your stories on our website. Thank you again for your participation.

For more information or questions please call Suzanne Roy at Chigamik...

Come back often to the site for news and updates. All breasts casts need to be ready not later than August 20th.

Here is some information on  making your breast cast.

**Material needed**
1 plastic drop cloth
1 jar petroleum jelly
1 pair gloves
3-4 rolls plaster casting material (each 4" x 5 yards)
1 sanding screen

**You will also need:**
Basin of room-temperature water
Chair
A helper



# The GroundSwell Project
using the arts to promote resilience and well-being through all phases of life

HOME | ABOUT ⯆ | DYING TO KNOW DAY ⯆ | MEDIA | CONTACT US | DONATE

OUR PROJECTS ⯆ | DIALOGUE ⯆ | VIEWING ROOM | GET INVOLVED | EVENTS | SOCIAL INNOVATION

## Busting Cancer – workshops!
BY KERRIE, ON JUNE 8TH, 2012%

Tweet 0



Busting Cancer women

"...its a great way of connecting with other cancer survivors and it says we are still proud of our bodies even with bits missing!!!"

"It was a thoroughly enjoyable experience and if other fellow cancer survivors can be offered this opportunity hopefully they too will gain the same sense of empowerment and camaraderie I felt. It also opens the opportunity for conversation about the battle against cancer... and the fact that it doesn't have to be a death sentence with early detection"

**Are you a woman who is living with or has been diagnosed with cancer?**

Busting Cancer is a unique project that brings to life the stories of women affected by cancer. Our workshops help you create a unique body cast sculpture that represents your experience of cancer and helps raise cancer awareness in the community. Workshops are hosted by women from your community, in a relaxed and private atmosphere.

**Next Workshop: Wentworth Falls Sunday 17th June 10am till 4pm**

**Additional** workshops planned for July/August: let us know if you want further information. Please consider **hosting** a workshop with your support group or friends (we come to you!). Contact Nicole on 0433 909 977 or bustingcancerproject@gmail.com

Keep up to date at the Busting Cancer Facebook Page

## II. Discussion

We start with the Examining Attorney's refusal of registration on the basis that the specimens of record are all unacceptable because they either fail to show the mark in the drawing or show the proposed mark but do not associate it with the identified services.

### A. *Sufficiency of Applicant's Specimens*

A service mark is "any word, name, symbol, or device, or any combination thereof ... [used] to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127. The specimens of use, which are required by Section 1 of the Lanham Act and 37 CFR § 2.56, must show an association between the mark and the services. As the Trademark Manual of Examining Procedure (TMEP) provides:

> To be acceptable, a service-mark specimen must show the mark sought to be registered used in a manner that demonstrates a direct association between the mark and the services. Essentially, the mark must be shown in a manner that would be perceived by potential purchasers as identifying the applicant's services and indicating their source.

TMEP § 1301.04(f) (citations and internal quotation marks omitted). *See also In re Universal Oil Prods. Co.*, 476 F.2d 653, 177 USPQ 456, 457 (CCPA 1973) ("[t]he minimum requirement is some direct association between the offer of services and the mark sought to be registered therefor"). We have said that a service mark must be "used in such a manner that it would be readily perceived as identifying" the services, which is "determined by examining the specimens of record in the application." *In re Moody's Investors Svc. Inc.*, 13 USPQ2d 2043, 2047 (TTAB 1989); *accord In re Osmotica Holdings Corp.*, 95 USPQ2d 1666, 1668 (TTAB 2010) ("At a minimum, the specimen must show a direct association between the services and the mark sought to be registered."). "A specimen that shows only the mark with no reference to, or association with, the services does not show service mark usage." *In re DSM Pharm., Inc.*, 87 USPQ2d 1623, 1624 (TTAB 2008).

- 10 -

The original specimen submitted with the application depicts the applied-for mark as shown below.



This specimen is a substantially exact representation of the mark as it appears in the drawing; however, there is no indication of the services recited in the involved application. As a result, this specimen of record fails to show the required association with Applicant's services.

Applicant submitted the following substitute specimen with its December 20, 2011 response to Office action:[5]

---

[5] TSDR p. 2-7.



# KEEP A BREAST / OUR MISSION ♡

The Keep A Breast Foundation™ is a 501 (c) (3) non-profit organization. Our mission is to help eradicate breast cancer by exposing young people to methods of prevention, early detection and support. Through art events, educational programs and fundraising efforts, we seek to increase breast cancer awareness among young people so they are better equipped to make choices and develop habits that will benefit their long-term health and well-being.

# THE TREASURED CHEST PROGRAM

The Keep A Breast Foundation's Treasured Chest Program strives to give women that are newly diagnosed with breast cancer a unique opportunity to document their body and their feelings at a specific time in their treatment by turning their casted torso into a beautiful piece of art. The Keep A Breast Foundation Breast Casts™ are part of KAB's unique education and support programs that harness the power of art and artistic expression to communicate complex feelings and thoughts about health, the female form and ultimately about breast cancer. Combining sculpture, philanthropy and symbolic artistry, the one-of-a-kind plaster forms of the female torso are given to the castee to document a specific point in their breast cancer journey.

KAB recognizes newly diagnosed women may be facing a dramatic change to their female form resulting in the loss of a breast (mastectomy), partial removal of a breast (lumpectomy) or shrinkage of a breast caused by radiation. The psychological changes that accompany a breast cancer diagnosis are just as important as possible physical changes. Others who are diagnosed with breast cancer will not have these procedures and the program is also designed to support these women. To learn more about taking part in this unique support program visit **keep-a-breast.org/programs/treasuredchest**

**Contact**
info@keep-a-breast.org   keep-a-breast.org

Keep A Breast is a "green" organization.
Please reuse and recycle.

   

For two reasons, this substitute specimen fails to show the proposed mark in a manner such that consumers would perceive it as an indicator of source for any of the identified services. First, we note that this specimen does not display the breast cast in the drawing, as required by 37 CFR § 2.51(a) ("the drawing of the mark must be a substantially exact representation of the mark as used on or in connection with the goods and/or services"), but rather displays six *different* breast casts, whose shapes appear to have been individually dictated by the shape of the different women to whose bodies they were individually molded. As explained in the first substitute specimen, Applicant assists women diagnosed with breast cancer in creating breast casts "as a unique opportunity to document their body and their feelings at a specific time in their treatment by turning their casted torsos into a beautiful piece of art." This specimen further explains by "[c]ombining sculpture, philanthropy and symbolic artistry, the one-of-a-kind plaster forms of the female torso are given to the castee to document a specific point in their breast cancer journey." Rather than indicating source, the breast casts are described in Applicant's own promotional materials as "one-of-a-kind plaster forms" created by individual women with assistance from Applicant. The breast casts thus appear to be individual works of art and lack uniformity. Because the specimen fails to depict "a substantially exact representation of the mark," *see* 37 CFR § 2.51, this specimen does not associate the mark depicted in the application with Applicant as a source of any of the recited services.

Second, this specimen appears to identify the recited services in all three classes not by the breast cast design, but rather by the more traditional word mark The Keep

A Breast Foundation™. Specifically, the breast casts themselves are discussed in relation to The Keep A Breast Foundation's "Treasured Chest Program" and The Keep A Breast Foundation Breast Casts™. In other words, the presence of these other, readily-perceived source identifiers on the substitute specimen makes it impossible to conclude that the public would perceive the casts themselves as source identifiers. *See* TMEP § 1301.04(d) ("The specimen must demonstrate the mark serving as a source indicator for the identified services.") In sum, the substitute specimen not only does not display the mark depicted in the drawing, but it also fails to show that the breast casts depicted therein serve as indicators of source for any of Applicant's recited services.

Applicant submitted a second substitute specimen, displayed below, with its July 17, 2012 response to Office action:[6]



---

[6] TSDR p. 7-9.

The photograph comprising the second substitute specimen displays five breast casts of different sizes and shapes on a table with other paraphernalia, including tee shirts, tank tops, backpacks and other items, apparently offered by Applicant. As with the first substitute specimen, this specimen gives no indication or makes any mention of the recited services, nor does it seek to associate the proposed mark to any such services. *See DSM Pharm.*, 87 USPQ2d at 1624 ("A specimen that shows only the mark with no reference to, or association with, the services does not show service mark usage."). *See also Osmotica*, 95 USPQ2d at 1668 ("It is not enough that the mark and a reference to the services both appear in the same specimen."); *In re Graystone Consulting Assocs., Inc.*, 115 USPQ2d 2035 (TTAB 2015).

In sum, we conclude that neither of the substitute specimens displays the breast cast design *depicted in the drawing*. And even were we to overlook that deficiency, the original and second substitute specimens do not associate breast casts *with any of the recited services*, such that the breast casts would be perceived as a source-identifier. And the first substitute specimen, while referencing the recited services, does not display the applied-for breast cast and, in addition, depicts other designations more likely to be perceived as the services' source identifiers. As a result, none of Applicant's proffered specimens are sufficient to support use of the proposed mark in connection with Applicant's services.

Accordingly, the Board affirms the refusal to register on the ground that the specimens of record fail to show use of the applied-for designation as a mark in connection with the recited services.

### B. Failure to Function as a Service Mark Under Sections 1, 2, 3, & 45

We next turn to the substantive refusal, under Sections 1, 2, 3, and 45 of the Lanham Act, that the applied-for mark does not serve to "identify and distinguish the services of one person . . . and to indicate the source of the services." 15 U.S.C. § 1127 (definition of "service mark). As has been frequently stated, "[b]efore there can be registration, there must be a trademark." *In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 215 (CCPA 1976). *See also In re Int'l Spike, Inc.*, 196 USPQ 447, 449 (TTAB 1977) (law pronounced in the *Bose* case is just as applicable to pictures and illustrations as it is to words: Trademark Act is for the registration, not the creation, of trademarks); *In re Ratcliff Hoist Co., Inc.*, 157 USPQ 118, 119 (TTAB 1969) (mere representation of an article of applicant's merchandise fails to function as a trademark for its goods).

Sections 1, 2, 3, and 45 of the Trademark Act provide the statutory basis for refusal to register subject matter that fails to function as a service mark. 15 U.S.C. §§ 1051, 1052, 1053, and 1127. Specifically, Sections 1, 2, and 3 provide, *inter alia,* for the application and registration on the Principal Register of trademarks "by which the goods [or services] of the applicant may be distinguished from the goods [or services] of others" and Section 45 defines a "service mark," in pertinent part, as "any word, name, symbol, or device, or any combination thereof used by a person ... to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services, even if that source is unknown." Accordingly,

the Office is statutorily constrained to register matter on the Principal Register only if it functions as a mark.

"[N]ot every designation adopted with the intention that it performs a trademark function and even labeled as a trademark necessarily accomplishes that purpose…." *Am. Velcro, Inc. v. Charles Mayer Studios, Inc.*, 177 USPQ 149, 154 (TTAB 1973); *see also Roux Labs., Inc. v. Clairol, Inc.*, 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970).

> The critical inquiry in determining whether a designation functions as a mark is how the designation would be perceived by the relevant public. To make this determination we look to the specimens and other evidence of record showing how the designation is actually used in the marketplace.

*In re Eagle Crest Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010) (citations omitted).

Thus, the central question in determining whether Applicant's proposed mark functions as a service mark is the commercial impression it makes on the relevant public (*e.g.,* whether the term sought to be registered would be perceived as a mark identifying the source of the services). *In re Aerospace Optico, Inc.,* 78 USPQ2d 1861, 1862 (TTAB 2006) ("the mark must be used in such a manner that it would be readily perceived as identifying the specified goods [or services]. ... The mere fact that a designation appears on the specimen of record does not make it a trademark. ... A critical element in determining whether matter sought to be registered as a trademark is the impression the matter makes on the relevant public." (citations omitted)). *See also In re Volvo Cars of North Am. Inc.,* 46 USPQ2d 1455, 1459 (TTAB 1998); *In re Remington Prods. Inc.,* 3 USPQ2d 1714, 1715 (TTAB 1987); *In re Morganroth,* 208 USPQ 284, 287 (TTAB 1980).

Based on our above review of the specimens of use submitted by Applicant as well as all other evidence of record, we agree with the Examining Attorney that Applicant's proposed mark fails to function as a service mark. As discussed above, the original specimen, and the first and second substitute specimens, all fail to associate the proposed mark with any of the recited services, thus making it unlikely that the relevant consumers will perceive the casts as indicating source. If anything, the applied-for mark appears to be created as part of the educational and associational services offered under the designation "Keep A Breast Foundation Treasured Chest Program." As stated in Applicant's pamphlet, "The Keep A Breast Foundation's Treasured Chest Program strives to gives women that are newly diagnosed with breast cancer a unique opportunity to document their body and their feelings at a specific time in their treatment by turning their casted torso into a beautiful piece of art." The evidence also shows that other charitable organizations in the same field similarly make breast/torso casts as part of their support services.

With its March 11, 2013, request for reconsideration, Applicant submitted by the declaration of its counsel, Sean Flaherty, copies of the following screen shots from Applicant's webpage showing its "Traveling Education Booth:"[7]

---

[7] TSDR p. 14-16. Applicant does not assert that this evidence is intended as a further substitute specimen, and we do not so construe it.

**Serial No. 85316199**



## TRAVELING EDUCATION BOOTH

The Keep A Breast Traveling Education Booth (TEB) is KAB's touring, interactive education platform. It is a grassroots teaching tool that brings our message of breast cancer awareness and prevention directly to young people at the events they attend. The TEB is constantly on the road. It is an influential presence on the Vans Warped Tour, SXSW, and at action sports events and gatherings worldwide.

In 2011 alone, the TEB was on the road for 476 events, at which KAB educated a combined total of over two and a half million people about breast cancer, breast cancer prevention, and early detection.

The TEB encourages young people to participate and learn in environments where they are already comfortable. It contains KAB reference materials such as our step-by-step Check Your Self! breast self-exam card, NTR Prevention Pocket Guide, and NTR Mini Zine. The TEB also has hands-on teaching tools such as the Breastology Bag, which contains breast shaped pillows that allow users to feel the difference between cancerous and non-cancerous lumps.

TEB visitors can share personal experiences through KAB's support programs, including This is My Story and Imagine If.... Of course, KAB representatives are available at every TEB to answer questions and provide resources.

### HOW DOES IT SUPPORT THE KAB MISSION?

The TEB brings breast cancer education to young people on their own turf. It is an accessible "first step" to awareness and support. It is key to KAB's appeal to our target demographic. Through the TEB, we can encourage young people to be their own breast cancer advocates.

### CAN I PARTICIPATE?

Any visitor to an event hosting the TEB is encouraged to experience this program. Chances are, if there is a major music festival, action sports, or arts event happening near you, KAB's Travelling Education Booth will be there.

### WHERE DO I START?

Visit Events or The Latest for information on upcoming dates and locations of the Travelling Education Booth !





This website evidence shows a painted breast cast on a table with other paraphernalia and informational material offered by Applicant and discusses educational programs in connection with breast cancer, but it is a cast different from the proposed mark in the drawing. Moreover, there is no indication that the breast cast configuration in the proposed mark is present on the website, much less that it is intended to serve as an indicator of the source of Applicant's services.

Upon consideration of the entire record, we agree with the Examining Attorney that the applied-for matter as it is being used displays a breast cast that Applicant, as a part of its associational and educational services, assists women, including those diagnosed with breast cancer, in making. As such, the evidence shows that the cast will be perceived as part of the services rather than as a mark designating the source of the services.

*Acquired Distinctiveness Under Section 2(f)*[8]

As discussed above, the applied-for breast/torso cast fails to function as a mark. As a consequence, no amount of evidence of acquired distinctiveness can overcome such a refusal. *See* TMEP § 1212.02(i) ("[W]here the examining attorney has determined that matter sought to be registered is not registrable because it is not a mark within the meaning of the Trademark Act, a claim that the matter has acquired

---

[8] As discussed *infra*, we do not reach in this decision the Examining Attorney's refusal of registration under Sections 1, 2, 3 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053, 1127, on the ground that the proposed mark consists of nondistinctive trade dress that would not be perceived as a service mark, but merely as decoration or ornamentation. Our discussion of the sufficiency of Applicant's claim of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f) should not be misconstrued as a determination that the applied-for breast cast is distinctive or non-ornamental under Trademark Act Sections 1, 2, 3 and 45.

distinctiveness under §2(f) as applied to the applicant's goods or services does not overcome the refusal.") Nonetheless, in order to facilitate any judicial review of our final decision, we will assume, *arguendo*, that the breast casts in the specimens are the exact casts depicted in the drawing[9] and we will further assume that the specimens depict the cast in a way that seeks to have consumers associate the casts as an indicator of the source of Applicant's associational and education services. With those two assumptions, we now address Applicant's claim that the breast cast trade dress has acquired distinctiveness as an indicator of source.

A refusal to register non-distinctive trade dress based on its failure to function as a mark may be overcome by a showing of acquired distinctiveness under Section 2(f) of the Trademark Act. "The applicant … bears the burden of proving acquired distinctiveness." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015) (citation omitted). An applicant must show that the primary significance of a mark or trade dress in the minds of consumers is not the product or service but the source of that product or service to establish acquired

---

[9] Were the breast/torso casts offered by Applicant identical to the one depicted in the drawing (as discussed above, they are not), it would be conceivable that this case would present a question of inherent distinctiveness rather than one of failure to function as a trademark. But even then, the outcome would appear to be the same because the evidence in the record shows that several breast cancer organizations offer similar breast/torso casts as part of their similar associational and educational services. Compare *In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1687-88 (Fed. Cir. 2010) (because other providers of erotic dancing entertainment services featured performers wearing cuffs and collars, similar cuff and collars were not inherently distinctive for such services) with *In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396 (CCPA 1972) (design of a narrow, contrasting-color annular band mounted on the front computer tape reel flange, adjacent to and concentric with the hub of the reel; design held to be "potentially registrable as a trademark" in part because "there is no evidence here . . . that others in the industry have previously used . . . the same or very similar design, thereby destroying its capacity to serve as a trademark").

distinctiveness. *See id.*, 116 USPQ2d at 1265; *Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1283 (TTAB 2000).

Acquired distinctiveness may be shown by direct or circumstantial evidence. Direct evidence includes actual testimony or declarations of consumers as whether they view the proposed mark primarily as a source identifier, or surveys. Circumstantial evidence is evidence from which such consumer perception might be inferred, such as years of continuous and substantially exclusive use, sales and advertising data, and any similar evidence showing wide exposure of the mark to consumers in a manner that would educate consumers to view the proposed mark as a source indicator. *In re Steelbuilding.com*, 415 F.3d 1293, 1300, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005); *Ennco*, 56 USPQ2d at 1283.

There is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, however, the burden is directly proportional to the degree of non-distinctiveness of the mark at issue. *E.g.*, *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988); *Steelbuilding.com*, 75 USPQ2d at 1424; *see also Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 59 USPQ2d 1720, 1730-32 (1st Cir. 2001) (trade dress for common elements of candle labels is nondistinctive product packaging for which insufficient evidence of acquired distinctiveness shown); *EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 491, 37 USPQ2d 1646, 1649 (2d Cir. 1996) ("[C]onsumers do not associate the design of a product with a particular manufacturer as readily as they do a trademark or product packaging trade dress."). The Examining Attorney introduced evidence, excerpted

above, showing that Applicant's breast cast configuration is not an uncommon design, but rather is utilized by a number of third parties, some of which use and offer breast casting specifically to promote breast cancer awareness, treatment, fundraising and body image. As a result, and given the nature of Applicant's proposed mark, we find that a higher level of evidence is needed to establish prima facie acquired distinctiveness.

Applicant submitted three declarations and evidence in support of its claim of acquired distinctiveness:[10]

- Declaration of Michelle Wenner, Applicant's CFO, discussing Applicant's fundraising and expenditures.

- Declaration of Shaney Jo Darden, Applicant's Co-Founder and Global CEO, discussing length and manner of use of the applied-for mark and services provided by Applicant.

- Declaration of Sean Flaherty, Applicant's counsel, introducing copies of screen shots reproduced above from Applicant's webpage showing its "Traveling Education Booth."

As to the length of use, that the Lanham Act provides that evidence of substantially exclusive and continuous use for a period of five years immediately preceding filing of an application *"may"* be considered prima facie evidence of acquired distinctiveness. 15 U.S.C. § 1052(f) (emphasis supplied). However, the USPTO is not required in any case to accept a bare showing of five or more years' use,

---

[10] Applicant's March 11, 2013 request for reconsideration, TSDR p. 8-19.

even when it is substantially exclusive. *See, e.g., In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015) ("Although Section 2(f) . . . provides that that the PTO may accept five years of 'substantially exclusive and continuous' use as *prima facie* evidence of acquired distinctiveness, the statute does not require the PTO to do so."); *In re Deister Concentrator Co.*, 289 F.2d 496, 129 USPQ 314, 320 (CCPA 1961) (the Director "is neither bound to accept it nor limited by [§ 2(f)] as to what he may accept as proof of 'distinctiveness'"); *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381, 382-83 (CCPA 1960) (Section 2(f) itself "is silent except for the suggestion that substantially exclusive use for a period of five years immediately preceding filing of an application may be considered prima facie evidence. Congress has chosen to leave the exact degree of proof necessary to qualify a mark for registration to the judgment of the Patent Office and the courts."); *Ennco*, 56 USPQ2d at 1286 (language of the statute is permissive, and the weight to be accorded this kind of evidence depends on the facts and circumstances of the particular case). Given that the alleged mark is not Applicant's main identifier (Keep A Breast Foundation is), and given that it is in the form of a product, which consumers do not tend to view as marks but as what they are (products),[11] we find Applicant's use since April 2000 is insufficient, in itself, to demonstrate that consumers perceive

---

[11] *See, e.g., Wal-Mart Stores Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1069 (U.S. 2000) ("In the case of product design . . . we think consumer predisposition to equate the [product] feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.")

the breast/torso cast as an indicator of source. *See, e.g.*, *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1551 (Fed. Cir. 1984) ("The affidavits of Petersen are devoid of facts from which a conclusion of secondary meaning could be drawn. No evidence came from consumers that they rely on shape alone, rather than on the prominently displayed word mark VISE-GRIP, to identify the source of the product."); *In re McIlhenny Co.*, 278 F.2d 953, 126 USPQ 138, 141 (CCPA 1960) (promotion of a bottle design bearing other trademarks is insufficient under section 2(f) to show that the public views the bottle design alone as a trademark).

Applicant also provides evidence that it has raised over $ 1 million in charitable donations and spent over $100,000 on advertising for the services. Generalized information about a business's financial success (here, charitable donations, but for commercial entities, gross sales across a company) are of minimal probative value where there is no additional evidence that differentiates with regard to what amounts were raised or taken and spent in connection with the mark at issue (here, the breast cast design). Without more, this generalized figure does not permit any inference to be drawn about whether consumers perceive the particular applied-for breast cast design as an indicator of a unique source.[12] We note that the evidence shows that Applicant displays its breast/torso casts in booths along with other potential identifiers (the Save a Breast Foundation logo) and promotes it under the name "Treasured Chest Program." Thus we cannot infer from Applicant's advertising or booth displays that consumers will perceive the breast/torso cast, amid these other

---

[12] We recognize that Applicant is a non-profit organization and that its promotional expenditures, while modest, represent a significant percentage of its resources.

more traditional designations, as a source indicator. *See, e.g., In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 3 USPQ2d 1727, 1729 (Fed. Cir. 1990) (sales and advertising figures alone may not suffice where other marks were featured with the mark at issue or the growth could be attributed to the product's popularity); *see also In re Boston Beer Co. L.P.*, 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) (finding claim based on annual sales under the mark of approximately eighty-five million dollars, and annual advertising expenditures in excess of ten million dollars -- two million of which were spent on promotions and promotional items which included the phrase THE BEST BEER IN AMERICA -- insufficient to establish distinctiveness, in view of the highly descriptive nature of the proposed mark); *In re Tennis Industry Ass'n*, 102 USPQ2d 1671, 1682 (TTAB 2012) ("Sheer numbers alone are not necessarily enough to prove secondary meaning.") (citation omitted).

The Darden declaration indicates that the 1,500 breast casts developed by Applicant include those of numerous celebrities, musicians and professional athletes, and that printed and electronic media outlets have "conducted, broadcast, or published stories about The Keep A Breast Foundation's Breast Casts and the organization's services associated with the Breast Cast campaigns." However, there is neither explanation in the declaration nor any supporting evidence to indicate the extent to which the asserted media coverage displays or discusses the breast cast trade dress as a mark used in association with Applicant's recited services such that we may conclude that the breast casts were "widely promoted" *as an indicator of*

*source*, such as through "look for" advertising.[13] As discussed above, Applicant's evidence shows that a breast cast is present in its travelling education booth, but the cast neither displays the applied-for mark nor shows use of it in the manner of a service mark in connection with Applicant's services.

We note once more that the dozen breast casts pictured in Applicant's specimens and Traveling Education Booth screenshot differ from one another in accordance with the proportions of the women from whom they were cast, and differ from the rather stylized breast cast depicted in the drawing. This apparent lack of uniformity (which likely extends to the 1,500 breast casts Applicant has made based on different women with diverse proportions) further undercuts Applicant's ability to transform the number of casts it has made into reliable evidence that such individualized casts serve as a trademark.

Simply put, Applicant's declarations and evidence demonstrate that female celebrities, musicians and athletes are willing to create breast casts of their unique breasts and torsos for Applicant and that other celebrities, musicians and media outlets have promoted such breast casts. However, Applicant's declarations and evidence do not reveal the extent, if any, to which consumers of Applicant's services perceive its breast cast trade dress as a source identifier. *See, e.g., In re Teledyne Indus., Inc.*, 212 USPQ 299, 300 (TTAB 1981) ("Mere depiction of a product in advertising does not demonstrate that it is used as a mark."); *see also Wal-Mart*

---

[13] For examples of successful "look for" advertising of the sort that is lacking here, see *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 423-24 (Fed. Cir. 1985); *In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396, 398-99 (CCPA 1972); *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381, 382-83 (CCPA 1960).

*Stores,* 54 USPQ2d at 1069 (consumers tend to view products as products, not as source identifiers, unless successfully conditioned to override this predisposition). There is no evidence that any of the asserted media exposure directs viewers to perceive the breast cast as identifying Applicant as the source of services or as something other than the cast of an individual woman's breasts and torso. Moreover, the Examining Attorney's evidence that third parties offer breast casting as part of their own breast cancer awareness programs strongly undercuts Applicant's claim that it is making substantially exclusive use of its proposed breast cast configuration as a service mark or trade dress.

In that regard, Section 2(f) requires that the Applicant's use of a particular device be "substantially exclusive." Thus, "[w]hen the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances." *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984). The record indicates such third-party use here, and thus Applicant's attempt to prove that its breast/torso cast design services as an indicator of a *unique* source falters on this basis as well. *See also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 97 USPQ2d 1048, 1057-58 nn. 4 & 5 (Fed. Cir. 2010); *Quaker State Oil Ref'g Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 172 USPQ 361, 363 (CCPA 1972).

In sum, after careful review of all of the evidence of record, including any evidence not specifically discussed herein, we agree with the Examining Attorney that Applicant's evidence of acquired distinctiveness is insufficient to permit registration of the breast cast configuration under Section 2(f).

### III.  Decision:

(1) the refusal to register the applied-for matter pursuant to Sections 1 and 45 of the Trademark Act, and related rules, on the ground that the original specimens, as well as the first and second substitute specimens, do not show use of the applied-for mark in connection with any of the services specified in the application, is affirmed;

(2) the refusal to register pursuant to Sections 1, 2, 3 and 45 of the Trademark Act on the ground that the applied-for trade dress fails to function as a service mark is affirmed; and

(3) Applicant's evidence of acquired distinctiveness is insufficient to permit registration of the applied-for trade dress under Section 2(f).

In view of our decision herein, we need not and do not reach a determination on the Examining Attorney's fourth alternative ground for refusal of registration, *i.e.*, that, pursuant to Sections 1, 2, 3 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053, 1127, the proposed mark consists of nondistinctive trade dress that would not be perceived as a service mark, but merely as decoration or ornamentation.