THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:
April 10, 2017

Mailed:
August 22, 2017

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re General Mills IP Holdings II, LLC*

_____

Serial No. 86757390

_____

William G. Barber, Christopher M. Kindel and Steven M. Espenshade of Pirkey Barber PLLC for General Mills IP Holdings II, LLC.

Tasneem Hussain, Trademark Examining Attorney, Law Office 118 (Thomas G. Howell, Managing Attorney).[1]

_____

Before Richey, Deputy Chief Administrative Trademark Judge, Mermelstein and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

General Mills IP Holdings II, LLC ("Applicant") has filed an application[2] to register on the Principal Register the proposed mark shown below for "Toroidal-shaped, oat-based breakfast cereal," in International Class 30:

---

[1] At oral hearing, Michael W. Baird argued on behalf of the USPTO.

[2] Application Serial No. 86757390 was filed on September 15, 2015 under Trademark Act Section 1(a), 15 U.S.C. § 1051(a), stating May 3, 1941 as the date of first use and first use in commerce. Page references to the application record refer to the .pdf version of the USPTO's Trademark Status & Document Retrieval (TSDR) system. References to the briefs refer to the Board's TTABVUE docket system.



As stated in the application, "The mark consists of the color yellow appearing as the predominant uniform background color on product packaging for the goods. The dotted outline of the packaging shows the position of the mark and is not claimed as part of the mark." A specimen of the use of the proposed mark, submitted with the application, is shown below:



Applicant requested registration under Section 2(f), 15 U.S.C. § 1052(f), stating through one of its officers that "consumers have come to identify the color yellow, when used in connection with the goods, comes [*sic*] from not only a single source, but specifically the Cheerios brand."[3] Applicant filed with its application voluminous evidence to support its claim of acquired distinctiveness, including a survey and expert report.

---

[3] Declaration of James H. Murphy ¶27, Application at 70.

The Trademark Examining Attorney refused registration under Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, and 1127, on the ground that a single color mark is not inherently distinctive and, because Applicant failed to demonstrate acquired distinctiveness, the applied-for trademark fails to function as a mark. When the Examining Attorney made her refusal final, Applicant appealed to this Board. The case is fully briefed. An oral hearing was held on April 10, 2017.

There is no doubt that a single color applied to a product or its packaging may function as a trademark and be entitled to registration under the Trademark Act. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161 (1995). However, such a color can never be inherently distinctive as a source indicator. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000) (citing *Qualitex*, 34 USPQ2d at 1162-63). As the *Qualitex* Court observed:

> [A] product's color is unlike "fanciful," "arbitrary," or "suggestive" words or designs, which almost *automatically* tell a customer that they refer to a brand. … But, over time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand. And, if so, that color would have come to identify and distinguish the goods -- *i.e.* "to "indicate" their "source" -- … [*sic*].

*Qualitex*, 34 USPQ2d at 1162-3 (citations omitted). The Federal Circuit has similarly observed:

> … [C]olor is usually perceived as ornamentation. While ornamentation is not incompatible with trademark function, "unless the design is of such nature that its distinctiveness is obvious, convincing evidence must be forthcoming to prove that in fact the purchasing public does recognize the design as a trademark which identifies the source of the goods."

*In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985) (quoting *In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1, 2 (CCPA 1961)).[4] Here, Applicant argues that the purchasing public recognizes the color yellow on packages of toroidal (ring or doughnut-shaped) oat-based breakfast cereal as an indication that Applicant is the source of the cereal.

"To establish secondary meaning, or acquired distinctiveness, an applicant must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Coach Svcs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1729 (Fed. Cir. 2012) (internal quotation marks omitted). We determine whether Applicant's asserted mark has acquired distinctiveness based on the entire record, keeping in mind that "[t]he applicant … bears the burden of proving acquired distinctiveness." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015) (citation omitted). The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and the nature of the mark sought to be registered. *See Roux Labs., Inc. v. Clairol Inc.*, 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970); *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381, 383 (CCPA 1960). Typically, more evidence is required where a mark is such that purchasers seeing the matter in relation to the offered goods would be less likely to believe that

---

[4] A color mark that is not functional may, upon a showing of acquired distinctiveness, be registrable on the Principal Register under Section 2(f), 15 U.S.C. § 1052(f). *See* Trademark Manual of Examining Procedure ("TMEP") § 1202.05(a) (Apr. 2017 version). Without such a showing, it may be registrable on the Supplemental Register (which Applicant does not seek).

it indicates source in any one party. *See In re Bongrain Int'l Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 n.9 (Fed. Cir. 1990). "By their nature color marks carry a difficult burden in demonstrating distinctiveness and trademark character." *In re Owens-Corning,* 227 USPQ at 424.

Applicant applies the color yellow to packaging of "regular CHEERIOS cereal,"[5] an example of which is shown above in Applicant's specimen of use. Applicant's declarant refers to this variety of the cereal as "Yellow Box Cheerios." The record indicates that, in addition to "regular CHEERIOS," Applicant offers CHEERIOS brand cereal in a variety of flavors, not all of which are packaged in yellow:[6]

  

The record before us shows that Applicant has sold oat-based breakfast cereal under the brand CHEERIOS continuously since 1945 (and as early as 1941 under the name CHEERIOATS).[7] In the decade preceding the 2015 Murphy declaration, Applicant expended over $1 billion in marketing Yellow Box Cheerios, achieving "50 million impressions."[8] Sales during that decade exceeded $4 billion. A single television

---

[5] Murphy Declaration ¶¶ 6, 17, Application at 66, 68.

[6] Applicant's response of May 18, 2016 at 279, 298, 307, 226, and 229.

[7] Murphy declaration ¶ 4, Application at 65.

[8] *Id.*, ¶¶ 9, 12, Application at 66, 67.

advertisement for CHEERIOS depicting the yellow box, which aired 200 times during the 2014 Super Bowl (which attracted 111.5 million viewers),[9] and which featured an interracial family, generated a measure of controversy, resulting in "11 million online views and half a million social actions, including tweets, likes, and shares."[10] According to *The Wall Street Journal*, Applicant's CHEERIOS brand and Kellogg's SPECIAL K brand, together, accounted for a third of all television advertising by the breakfast and cereal industry in the first half of 2014, with CHEERIOS substantially exceeding the advertising expenditures of SPECIAL K.[11] The record includes evidence of many unsolicited expressions of interest in the brand. USA Today referred to CHEERIOS as "the most popular cereal brand in American grocery stores."[12] An article about NBA uniforms referred to CHEERIOS as an example of brand loyalty and goodwill.[13] An article entitled "3 Cereal Brands That Will Never Get Stale for American Consumers" compared CHEERIOS to TRIX and RICE CRISPIES brand cereals.[14]

Of course, the question before us is not whether customers recognize the *term* CHEERIOS as Applicant's source-indicator. It is whether customers recognize *the*

---

[9] Application at 34.

[10] Murphy declaration ¶ 14, Application at 68.

[11] "Cheerios is King of Commercial Spending Among Cereal Brands," July 17, 2014, Application at 28.

[12] "Cheerios turns 70; iconic cereal endures, sells," Applicant's response of May 18, 2016 at 200.

[13] "Uni Watch: Why NBA uniforms should be ad-free zones," *id*. at 212.

[14] *Id*. at 229-230.

*color yellow on a package of toroidal-shaped, oat-based breakfast cereal* as an indicator that the cereal within comes from the maker of CHEERIOS.

Applicant has made of record numerous examples of its packaging and advertising materials for every decade since the 1940s, and it is apparent that Applicant has prominently featured the color yellow on the front of its boxes since the days of CHEERIOATS. At least as early as 1944, the color yellow also began to appear prominently on the back of the box and on other panels of the box. Although many variations of the artwork on the box appeared over the years, the overall trade dress of the box has been relatively consistent since the 1940s. Among the most consistent features has been prominent use of the word mark "Cheerios" (or "Cheerioats") displayed at the top of the front panel in a black, initial-capital typeface that is quite similar to today's typeface. Another relatively consistent feature is a photograph of a bowl of cereal occupying the center of the front panel. In Applicant's print and television advertisements, the color yellow is noticeably featured not only on the cereal box but on backgrounds, props, clothing worn by actors and models, and in other ways. Television advertisements from 1994, 1995 and 1997 featured a musical jingle beginning with the words, "It's the big yellow box that everyone knows …" and ending with the tag line, "The one and only CHEERIOS." In a television spot of 1991, an actor refers nostalgically to "that yellow box."[15]

---

[15] Audio-visual materials submitted with Applicant's response of May 18, 2016.

It is clear that Applicant has worked assiduously to create an association between the color yellow and its "regular" CHEERIOS brand cereal.[16] Applicant has submitted the following examples of public recognition, among many others:

> The iconic cereal known by its distinctive yellow box, is 70 years old this year and still a force on the breakfast cereal market. (USA Today, Applicant's response of May 18, 2016 at 200.)[17]

> Basically, Trix didn't have the cover of the overall Cheerios brand, which has long marketed itself as "made with 100% whole grain." Its yellow box is instantly recognizable (and even nostalgic for some). (Stealing Share, *Id*. at 265.)

> The yellow Cheerios box has been an iconic item in American households. People can easily recognize this bright yellow box and its simplicity in the crowded cereal shelves. (Loyola Digital Advertising, *Id*. at 274.)

> That's an alarming increase when compared to the single gram that sits in each serving of the original Cheerios that come in that iconic yellow box. (*Id*. at 206.)

> The De Blasios welcomed the comparison; a post on Bill's campaign website entitled "Cheerios" features the family posed around the cereal's signature yellow box. (*Id*. at 210.)

> Let's say you like Cheerios. Sure, you've internalized a positive emotional association with the yellow box and the logo, but your loyalty is ultimately based on how much you like the cereal. (*Id*. at 212.)

> Cheerios are easy to find on store shelves: Just look for the big yellow box. (*Id*. at 216.)

---

[16] We note, however, that no matter how hard a company attempts to make an inherently nondistinctive word or symbol serve as a unique source identifier, it is proof of results—that consumers so perceive the purported mark—that is the touchstone of our inquiry into acquired distinctiveness. *E.g.*, *Plastilite Corp. v. Kassnar Imps.*, 508 F.2d 824, 184 USPQ 348, 350 (CCPA 1975).

[17] Many of the news clippings submitted by Applicant lack an indication of the publication in which they appeared. Where the source is apparent, we cite it.

> There are now 13 types of Cheerios on grocery store shelves, which some fans of the original in the iconic yellow box think are 12 too many. (*Id.* at 226.)
>
> While General Mills has occasionally used mascots like Cheeri O'Leary for brief periods of time, the company predominantly relies on a simple yellow box and a bowl full of toasted oats. (*Id.* at 230.)

Applicant also proffered a survey (to be discussed at greater length *infra*), in which subjects were shown an image of an unmarked, yellow, rectangular box and were asked "If you think you know, what brand of cereal comes in this box?" Of 419 subjects, 221 (52.7%) identified the brand as CHEERIOS. Correcting this result for "noise," Applicant's expert concluded that 48.3% of respondents associated the yellow box with the CHEERIOS brand. Nearly all respondents who made the association stated that the yellow color of the box was the reason for their response.[18]

Applicant argues that, in seeking a registration under Section 2(f), its burden is limited to presenting a *prima facie* case of acquired distinctiveness, citing *Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1004. Applicant also points out that any doubt should be resolved in Applicant's favor.[19] Applicant faults the Examining Attorney for placing an improperly heavy evidentiary burden on Applicant and requiring Applicant "to show overwhelming or universal consumer recognition of Applicant's mark …."[20] Applicant's brief includes extensive

---

[18] Expert report of Dr. Isabella Cunningham, Applicant's response of May 18, 2016 at 316-321.

[19] Applicant's brief at 6, 4 TTABVUE 7.

[20] *Id.*

9

comparisons between Applicant's case and other cases regarding acquired distinctiveness, and argues that "Applicant's evidence of acquired distinctiveness far surpasses that previously accepted by the PTO, the Federal Circuit, and federal courts, as sufficient to show acquired distinctiveness of a color mark."[21] Applicant contends that its evidence "presents not merely a *prima facie* case, but rather conclusively establishes that the Cheerios Yellow Box Mark has acquired distinctiveness under relevant precedent …."[22]

The Examining Attorney argues that Applicant's proposed mark fails to function as a trademark because purchasers will perceive the color yellow merely as a decorative feature of the packaging for the goods, as they are accustomed to encountering cereal packages—even those for toroidal shaped oat-based cereals—in a variety of colors, including yellow. According to the Examining Attorney, the variety of colors on cereal boxes preconditions a consumer into believing that the applied-for color (like other colors) serves primarily as a form of decoration (*i.e.*, it has a primary purpose other than to indicate the source of the goods).[23]

Contrary to Applicant's contention, an applicant's presentation of a *prima facie* showing of acquired distinctiveness does not end the inquiry. If an examining attorney presents countervailing evidence, we make our determination on the basis

---

[21] *Id*. at 7, 4 TTABVUE 8.

[22] *Id*. at 18, 4 TTABVUE 19.

[23] Examining Attorney's brief, 6 TTABVUE 3-4.

of the entire record, with the applicant bearing the ultimate burden of persuasion. *In re La. Fish Fry Prods.,* 116 USPQ2d at 1264.

The Examining Attorney primarily bases her refusal on a lack of exclusive use of the color yellow by Applicant: "Because the record confirmed that applicant did not have 'substantially exclusive' use of the color yellow on cereal boxes, no amount of commercials or surveys would render the mark registerable under Section 2(f)."[24] *See, e.g., Levi Strauss & Co. v. Genesco, Inc.,* 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances."). But it is important to note that the Federal Circuit later added further nuance to that statement in *L.D. Kichler Co. v. Davoil Inc.,* 192 F.3d 1349, 52 USPQ2d 1307 (Fed. Cir. 1999). In that decision, the Court approved the language of TMEP § 1212.05(b) stating that the wording "substantially exclusive" "makes allowance for use by others which may be inconsequential or infringing and which therefore does not necessarily invalidate the applicant's claim." *See* 52 USPQ2d at 1309. Thus, in order to determine what constitutes substantial exclusivity in a particular case, we consider all relevant market evidence, including evidence of an applicant's efforts to promote public perception of its mark as a source-indicator and evidence indicating whether such efforts have succeeded. *See Owens-Corning,* 227 USPQ at 419 ("As for all marks,

---

[24] *Id.,* 6 TTABVUE 6.

compliance with the legal requirements for registration depends on the particular mark and its circumstances of use. In determining registrability of color marks, courts have considered factors such as the nature of the goods, how the color is used, the number of colors or color combinations available, the number of competitors, and customary marketing practices.").

Nonetheless, non-exclusive use presents a serious problem for the merchant seeking to develop trademark rights in a word, symbol, or device that is not inherently distinctive, because it interferes with public perception that it serves as an indicator of a single source:

> Distinctiveness is acquired by "substantially exclusive and continuous use" of the mark in commerce. A color which is employed by others in the industry acts not as an indicator of source but as mere ornamentation.

*Owens-Corning*, 227 USPQ at 424 n.11 (citation omitted). *See also Levi Strauss*, 222 USPQ at 940-41 ("In respect of registration, there must be a trademark, i.e., purchasers in the marketplace must be able to recognize that a term or device has or has acquired such distinctiveness that it may be relied on as indicating one source of quality control and thus one quality standard."); *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 97 USPQ2d 1048, 1057 n.5 (Fed. Cir. 2010) (applying Third Circuit law, affirming summary judgment finding lack of acquired distinctiveness where "at least one of ERBE's competitors uses blue flexible endoscopic probes—and thus the requisite secondary meaning is missing here."). In light of the foregoing principles, we consider the record as a whole in order to determine whether Applicant's marketing and promotional efforts have succeeded in

causing relevant customers to recognize the color yellow on packaging for oat-based breakfast cereal in toroidal form as an indication of the source of that cereal. Among other factors, it is appropriate to consider the circumstances under which Applicant's mark is used, "the number of competitors, and customary marketing practices." *Owens-Corning*, 227 USPQ at 419.

In her brief, the Examining Attorney points to 23 cereal products that she contends are offered in packaging similar in color to that of Applicant.[25] Applicant argues that much of the evidence relating to these products is unreliable and non-probative, because "there is no proof that the alleged product is actually being sold within the United States."[26] Applicant points out that some of the purported products are not real products, but parodies; and suggests that others may not have been sold in the United States "for years if not decades."[27] Some of the Examining Attorney's internet evidence shows sufficient indicia of authenticity to persuade us that it reflects relevant U.S. market conditions. For example, several of the products are offered by companies that, according to the record,[28] are recognized as Applicant's biggest competitors: Kellogg, Post, and Quaker. Some of the evidence indicates that the products are in stock with Amazon.com or its associated vendors. Further, some of

---

[25] Examining Attorney's brief, 6 TTABVUE 8.

[26] Applicant's brief at 21, 4 TTABVUE 22.

[27] *Id*.

[28] *See* "Breakfast cereal and the breakfast food market," Applicant's response of May 18, 2016 at 260-273. *See also* "Feeling its Oats, Cheerios to Add 'Ancient Grains,'" *id*. at 280, for other references to Kellogg and Post.

Applicant's survey subjects showed their awareness of several of the products, especially Honey-Comb and Corn Pops.[29] We have, of course, given no weight to parodies of breakfast cereal packaging. However, Applicant has not adduced evidence to support its contention that some of the products shown are no longer offered; the burden of rebutting the Examining Attorney's evidence rests on Applicant.[30]

Among the products shown in the Examining Attorney's evidence, we note the following toroidal-shaped, oat-based cereals offered under the brands Trader Joe's, Meijer, Wegmans, Nature's Path, One Degree, Ralston, and Barbara's:

---

[29] The survey disclosed some customers' awareness of brands (or products) identified as follows in the survey responses: corn chex, corn flakes, corn pops, crispy rice, frosted flakes, golden grahams, Granola, Honeycomb, kix, pops, Lucky charms, post, sugar pops, Kellogs, krave, Raisin nut bran, Weetabix, and Wheaties. *See* Applicant's response of May 18, 2016 at 436-453.

[30] We do not mean to suggest that the fact that a product was on the market at one time but is no longer currently on the market requires that it be considered completely irrelevant to acquired distinctiveness. Its impact on consumer perception is not immediately and automatically erased when it exits the market. But its probative value is certainly proportionate to the length of time it was on the market and inversely proportionate to the length of time between when it exited the market and the time at which acquired distinctiveness is being determined. *Cf. Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1730 (acquired distinctiveness is determined on the basis of facts as they exist at the time when the issue of registrability is under consideration).





31

32

33





34

35

36



37

---

31 Office Action of November 19, 2015 at 32.

32 Office Action of June 2, 2016 at 71.

33 *Id.* at 82.

34 *Id.* at 17-18.

Other examples of toroidal-shaped, oat-based cereals in yellow packaging are of record.[38] We also note the following oat-based cereals from Malt O Meal, a brand that was known to subjects in Applicant's survey:[39]

 40  41

The cereals shown above demonstrate that Applicant is not alone in offering oat-based cereal, or even toroidal-shaped, oat-based cereal, in a yellow package. Applicant has not put forward any evidence to indicate that we should consider these product packages "inconsequential or infringing," as contemplated by *L.D. Kichler Co. v. Davoil Inc., supra*. The presence of products of this type in the marketplace interferes with the development among relevant customers of a perception that the color yellow on packaging indicates that Applicant is the source of the goods (or that there is *any* single source of such goods). We also note the following Kellogg, Post, and Quaker

---

[35] *Id*. at 19-21.

[36] *Id*. at 23-24.

[37] *Id*. at 56-58.

[38] *See* Office Action of June 2, 2016 at 25-26, 51-52, 66, 75, and 76-77.

[39] Applicant's response of May 18, 2016 at 426, 453.

[40] Office Action of June 2, 2016 at 29.

[41] *Id*. at 30.

products in the record packaged in yellow boxes, one of which is oat-based and two of which are toroidal in shape:

   

  

We are cognizant that Applicant has limited its identified goods to toroidal-shaped oat-based cereals, such that the registration certificate it seeks would be evidence

---

[42] Office Action of November 19, 2015 at 34.

[43] Office Action of June 2, 2016 at 11. The Honey Graham Oh's product appears to have been offered by both Post and Quaker, in nearly identical packaging. *See* Office Action of November 19, 2015 at 33.

[44] Office Action of June 2, 2016 at 15.

[45] *Id.* at 35.

[46] Office Action of November 19, 2015 at 8.

[47] *Id.*

[48] *Id.* at 13.

only of Applicant's exclusive right to use the color yellow on packaging for that specific type of cereal. 15 U.S.C. §§ 1057(b) and 1115(a). However, we find that the presence in the market of yellow-packaged cereals from various sources – even cereals that are not made of oats or are not toroidal in shape – would tend to detract from any public perception of the predominantly yellow background as a source-indicator pointing solely to Applicant. The record shows that it is common for a manufacturer of breakfast cereal, such as Applicant, Kellogg, or Post, to offer a wide variety of different types of cereal.[49] Cereals of many different brands and varieties are offered side-by-side in stores[50] and compete directly for the same customers.[51] Such customers, accustomed to seeing numerous brands from different sources offered in yellow packaging, are unlikely to be conditioned to perceive yellow packaging as an indicator of a unique source. Rather, they are more likely to view yellow packaging simply as eye-catching ornamentation customarily used for the packaging of breakfast cereals generally.

Applicant argues that the evidence of third-party use is irrelevant because it shows use of "completely different marks and color schemes."[52] We do not agree. Applicant

---

[49] Applicant itself has offered as many as 13 different flavors of Cheerios. Response of May 18, 2016 at 189, 227. *See infra* varieties of products offered by Kellogg, Post and Quaker. Applicant's offering of Cheerios of different flavors, in packages of different colors, may interfere with the development among relevant customers of a perception that the color yellow on packaging indicates that Applicant is the source of Cheerios.

[50] *See, e.g.*, Applicant's response of May 18, 2016 at 229 and 292.

[51] *See id*. at 229-230 ("3 Cereal Brands That Will Never Get Stale for American Consumers"); 260-273 ("Breakfast cereal and the breakfast food market"); 313-315, ("The Best Dry Cereal for Toddlers").

[52] Applicant's brief at 21, 4 TTABVUE 22.

does not seek to register a multi-component "color scheme" or any multi-element trade dress in its entirety. It wishes to register the specific color yellow shown in its drawing "as the predominant uniform background color on product packaging …" The products shown above display a predominantly yellow background color on their packaging. Although the specific shade of yellow shown on these products may differ from that of Applicant, they are sufficiently close in hue to reduce the distinctiveness in the marketplace of Applicant's use of the color yellow.

It is significant to our analysis that the packages on which Applicant uses the proposed mark are rectangular boxes, similar in proportions to the one shown in the drawing of Applicant's mark;[53] and that competitors that use the color yellow also use it on similar rectangular boxes.[54] Competitors' use of yellow on similarly shaped packages lessens the impact of Applicant's uses upon customers' perceptions and reduces the likelihood that customers will perceive the color yellow as indicating Applicant as the single source.[55]

We find the number and nature of third-party cereal products in yellow packaging in the marketplace to be sufficient to convince us that consumers do not perceive the color yellow as having source-indicating significance for the goods. Several of the

---

[53] We note, however, that the drawing and description of the mark do not limit the mark to the color yellow on a "box" of breakfast cereal, and thus the mark includes other forms of product "packaging," such as a soft plastic bag.

[54] The one exception of record is the Oat Blenders product in a soft bag. Office Action of June 2, 2016 at 29.

[55] As is discussed above, we have noted and given weight to the fact that Applicant uses the color yellow not only on packaging, but also as a feature of its print and television advertisements, *e.g.*, as the color of backgrounds, props, and actors' clothing, among other ways.

third-party products in yellow packaging are offered by major competitors of Applicant and there is a substantial number of such products. Moreover, the number of third-party cereal products that use yellow as a predominant background color of their packaging suggests that the competitors may be exploiting an aspect of the packaging that has "intrinsic consumer-desirability" rather than any secondary meaning the color may have. 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:38 (4th ed. 2014, June 2017 Update) (citing *In re Van Valkenburgh*, 97 USPQ2d 1757, 1768 (TTAB 2011)).

As *Qualitex* and *Owens-Corning* teach, a color does not "*automatically*" indicate the source of the goods to a consumer, *Qualitex*, 34 USPQ2d at 1162; rather, it "is usually perceived as ornamentation." *Owens-Corning*, 227 USPQ at 422. The third-party products shown above appear to make use of the color yellow for purposes of ornamentation. It is possible that the color of the packages would help a customer to narrow down the number of cereal offerings to review on a large and crowded store shelf; but it is obvious that the word marks and graphic images are more important in conveying to the customer each unique brand of product offered. As the record shows, the breakfast cereal marketplace is awash in brightly colored packages bearing bold graphics and large-format word marks. There is no example in the record of any brand of cereal that is offered in a monochrome package devoid of word and design trademarks. In such an environment, customers certainly have no need to rely upon the background color of a package in order to know what brand they are buying. Notably, there is no suggestion that Applicant would expect its customers to select

20

their cereal on the basis of the color of the box. Even the examples of Applicant's "look for" advertising that are of record (television commercials touting "the big yellow box that everyone knows" and "that yellow box")[56] include repeated, prominent displays of the front of Applicant's box, with the mark CHEERIOS in bold, black letters in sharp contrast to the yellow background, as well as an audio track on which the term CHEERIOS is repeatedly sung or spoken.[57]

When customers see a color appearing on products from many different sources, they are less likely to expect the color to point to a single source of goods. Instead, customers are likely to perceive the color on packages as a device designed to make the packages attractive and eye-catching. This is especially true of a primary color, like yellow, which is used by many merchants and is not "a color that in context seems unusual." *Qualitex*, 34 USPQ2d at 1162-63. All of the cereal packages of record have *some* background color, and many of them include some shade of yellow, so Applicant's use of a predominantly yellow color scheme is unlikely to be seen as an indication of source. *Compare In re Hodgdon Powder Co.*, 119 USPQ2d 1254, 1259 (TTAB 2016) (recognizing the color white as a trademark for "gunpowder [which] is

---

[56] Audio-visual materials submitted with Applicant's response of May 18, 2016.

[57] Our primary reviewing court and other circuits have repeatedly cautioned that, where advertisements feature not only the mark in question but also other source indicators, that fact substantially diminishes the probative value of such advertising in proving that the alleged mark at issue serves primarily as a source identifier. *See, e.g., In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 5 USPQ2d 1828, 1830 (Fed. Cir. 1988); *Petersen Mfg. Co. v. Cent. Purchasing, Inc.*, 740 F.2d 1541, 222 USPQ 562, 569 (Fed. Cir. 1984); *In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975); *In re McIlhenny Co.*, 278 F.2d 953, 126 USPQ 138, 140-1 (CCPA 1960); *accord Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 95 USPQ2d 1333, 1349 (5th Cir. 2010); *Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 87 USPQ2d 1655, 1665 (3d Cir. 2008).

[normally] black or gray"). Alternatively, customers might perceive the various colors of cereal packages as a device to suggest something about the nature of the cereal, such as its flavor. (As shown above, Applicant offers different flavors of CHEERIOS brand cereals in packages bearing colors other than yellow.)

Pointing to its survey results, Applicant contends that its promotional efforts were successful in inculcating consumers to view yellow packaging as a source indicator. Applicant's survey shows, among relevant customers, a high level of awareness that CHEERIOS brand cereal is sold in a yellow box. However, when we consider the survey in the relevant commercial context, we find, as we explain below, that it does not demonstrate whether the color yellow, alone, distinguishes Applicant's goods from those of others, which is the core function of a trademark. *See* 15 U.S.C. § 1127 (a trademark is a "device … used by a person … to identify *and distinguish* his or her goods … from those manufactured or sold by others and to indicate the source of the goods …" (emphasis added)). Considering that there are hundreds of breakfast cereals that compete with Applicant's product, that nearly all of them are offered in brightly colored boxes, and that many of them make ornamental use of the color yellow, we believe, as we explain below, Applicant's survey should have taken into consideration the possibility that respondents might be able to name more than one breakfast cereal that is offered in a yellow box, thereby persuasively testing whether respondents were acquainted with such goods from sources other than Applicant. Because of the survey's design, we find that the survey results do not clearly demonstrate association of the color yellow with one particular source of goods.

The survey was administered by means of computer. Subjects were shown the below image and were told it was a "cereal box" and that "This box has been altered by removing the cereal brand name, logo, package images, and other package texts from the box."[58]



Subjects were asked the following question ("Question 1"): "If you think you know, what brand of cereal comes in this box?" The question was formatted as shown below:

If you think you know, what brand of cereal comes in this box?

⬚

◯ I don't know

On successive screens, subjects were asked the following questions:

> What, in particular, makes you think the brand is "**[Response to Q1]**"?
>
> Why do you think that?
>
> Anything else?

---

[58] Response of May 18, 2016 at 376. A control group of subjects was shown an image of a light blue "cereal box." *See id*. at 406.

> What is it about the cereal box that makes you associate it with "**[Response to Q1]**"?
>
> Anything else?

Of 419 subjects, only three answered Question 1 with more than one brand.[59] (Those three answers were "kix, pops, cheerios"; "rice, wheat or sometype of chex" [*sic*]; and "malt o meal value ones.")[60] Four others, after giving a singular answer to Question 1, answered the follow-up question "Anything else?" as follows:

- on the other hand it could be kelloggs corn pops

- not many other cereal have that colored box

- nope nothing or corn pops

- could be a lot of brands

Question 1 and the question following it, with their singular use of the word "brand," ("what *brand* of cereal comes in this box?"; "What… makes you think the *brand* is …?") indicate by their terms that a singular answer to the first question is expected. It is likely that subjects believed only a single brand should be named. This likelihood is reinforced by the very small number of subjects who gave a plural answer, and the fact that subjects who knew of several brands nonetheless gave a singular answer to the first question. For this reason, Question 1 likely elicited from the subjects the first brand that came to mind, but unless the subjects spontaneously elaborated, the survey would not show whether subjects believed the color yellow was

---

[59] *Id.* at 436-453.

[60] *Id.* at 446, 447, 453.

24

associated *only* with the maker of the Cheerios brand.[61] (Of 419 subjects, 23 indicated that Cheerios was the only brand, or the only brand they could think of, that is sold in a yellow box.) The evidence of record shows that the relevant marketplace includes scores of competing brands; there is an industry practice of ornamenting product packaging with bright colors; and the color that Applicant claims as its mark is in use on the packaging of others. When Applicant's survey is considered in such a commercial context, we find that, worded as it is, it does not establish that customers would perceive the yellow color of a package as an indication of a single source of the goods, such that Applicant should be able to claim the exclusive right to use that color. *See Levi Strauss,* 222 USPQ at 940 ("purchasers in the marketplace must be able to recognize that a term or device has or has acquired such distinctiveness that it may be relied on as indicating one source of quality control").

We are aware that, in *Owens-Corning,* the Federal Circuit was not moved by the criticism that the survey at issue "inhibited plural responses from persons who might have believed that more than one manufacturer makes 'pink' insulation." 227 USPQ at 424. However, the market conditions at issue in *Owens-Corning* differed significantly from those in the breakfast cereal industry. In *Owens-Corning,* there were few competitors and the applicant was the only one that used any added color, let alone the color pink. 227 USPQ at 420 ("It appears from the record that OCF is

---

[61] As an illustrative hypothetical, consider a survey that asked, "If you think you know, what university has TIGERS as its mascot?" Even if most respondents said LSU, that would not have proved that LSU had the exclusive right to TIGERS as a source indicator to the exclusion of Clemson, Auburn, Missouri, Princeton, Towson, Memphis, or many other schools.

the only manufacturer that colors this insulation, and that there are only a small number of producers.") The Court relied on the applicant's unique position in finding the survey probative: "We do not agree that such criticism requires outright rejection of survey data showing that 50% of the respondents named OCF, *the only manufacturer to color its insulation pink.*" 227 USPQ at 424 (emphasis added). To this sentence, the Court appended the following footnote: "Distinctiveness is acquired by "substantially exclusive and continuous use" of the mark in commerce. A color which is employed by others in the industry acts not as an indicator of source but as mere ornamentation." 227 USPQ 424 n.11 (citations omitted) (emphasis added). This passage and the accompanying footnote suggest that the probative value of the *Owens-Corning* survey would have been called into doubt if, as in our case, there were evidence of numerous competing brands and examples of third-party use of the asserted mark.

Applicant has made extensive and detailed comparisons between the case now before us and other single-color trademark cases in which acquired distinctiveness was found. Such comparisons are rarely helpful, because the critical facts of different cases almost always differ substantially. *Cf. In re Miller Int'l Co.*, 312 F.2d 819, 136 USPQ 445, 447 (CCPA 1963) (refusal to register mark as merely descriptive reversed; "as we have had occasion to observe many times in the past, prior decisions in trademark cases are of little help in deciding cases involving different marks and different facts. Each case must be decided on its own facts and issues"). For example, in *Qualitex* and *Owens-Corning*, the goods at issue were products that were not

usually given any artificial color at all, and the number of competing products was relatively limited. By contrast, the record shows that it is the norm to give the packaging of breakfast cereals bright colors, and scores of competing products can be found in a single aisle of a supermarket.[62] In *T-Mobile US, Inc. v. Aio Wireless LLC*, 991 F. Supp. 2d 888 (S.D. Tex. 2014), the number of competitors was small and the defendant essentially acknowledged its obligation to avoid use of colors similar to those used by competitors. In the present case, there is no evidence of such a viewpoint in the cereal industry. The prosecution histories of the third-party registrations[63] to which Applicant refers in Exhibit A of its brief are, for similar reasons, extremely difficult to compare in a meaningful way to Applicant's case. None of the third-party registrations relates to breakfast cereal, and it is highly likely that the market conditions prevailing in the registrants' industries differ substantially from those in the cereal industry.

Applicant has proven that relevant customers are familiar with the yellow color of the CHEERIOS box; but the record also indicates that the color yellow is only one aspect of a more complex trade dress that includes many other features that perform a distinguishing and source-indicating function. When we consider the industry practice of ornamenting breakfast cereal boxes with bright colors, bold graphic designs, and prominent word marks, and the fact that customers have been exposed to directly competing products (toroidal oat cereals) and closely related products

---

[62] *See, e.g.*, Applicant's response of May 18, 2016 at 229 and 292.

[63] Applicant's response of May 18, 2016 at 46-172.

27

(other forms of breakfast cereal) in packages that are predominantly yellow, we are not persuaded that customers perceive Applicant's proposed mark, the color yellow *alone*, as indicating the source of Applicant's goods. We find that Applicant has not demonstrated that its yellow background has acquired distinctiveness within the meaning of Section 2(f) and, accordingly, that Applicant has not shown that this device functions as a trademark.

**Decision:** The refusal to register Applicant's mark under Sections 1, 2, and 45 is affirmed.